STATE OF NORTH CAROLINA v. HAROLD GEROME WHITE

No. 90

(Filed 12 February 1975)

1. Homicide § 21— first degree murder — sufficiency of evidence

The State's evidence was sufficient for the jury in a prosecution for first degree murder where it tended to show that defendant had an argument with decedent, a restaurant owner, over the price of two hot dogs, that when defendant left the restaurant he stated, "You s.o.b. I will be back; I will get you," that a woman who left the restaurant with defendant returned to the restaurant and stated that defendant had gone to get a shotgun and was coming back, and that defendant returned to the restaurant with a shotgun, stated that he had come to kill decedent, and shot decedent to death with the shotgun.

2. Criminal Law § 102— capital case — jury argument about judicial or executive review

In a capital case, any argument made by the solicitor or by private prosecution appearing for the State which suggests to the jury that they can depend upon either judicial or executive review to correct any errors in their verdict, and to share their responsibility for it, is an abuse of privilege and prejudicial to the defendant.

395

State v. White

3. **Criminal Law § 102— capital case — argument that jury's verdict not final disposition — absence of objection — duty of court**

In a death case intimations by counsel for the State that a jury's verdict is not necessarily a final disposition of the case are so prejudicial that counsel's failure to make timely objection will not waive defendant's right to object, it being the duty of the trial judge to correct such an abuse at some time in the trial and, if the impropriety be gross, to interfere at once.

4. **Criminal Law § 102— capital case — prosecutor's jury argument about appeal of guilty verdict**

Argument by the private prosecutor in a capital case that "If found guilty, he gets an automatic appeal to the Supreme Court of North Carolina—it is necessary. If any error is made in this court, that Court will say," was improper; and the harmful effect of such argument was not removed when the trial judge sustained an objection to the argument and instructed the jury not to consider "what he said about the Supreme Court," or when the trial judge at the beginning of his charge stated, "The reason I sustained that objection, I want you all to understand is that the Supreme Court will review this case. That they would only send the case back if I made a mistake on a legal question. They will not review the decisions of the facts by the jury. The jury is the sole trier of the facts of this lawsuit."

5. **Criminal Law § 86— employment of private prosecutor — competency to show bias**

In this first degree murder prosecution, the trial court erred in the exclusion of cross-examination of decedent's wife as to whether she had employed private counsel in the case since such evidence was competent to show bias on her part against defendant.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.

Justice LAKE concurring in result.

Justice HUSKINS dissenting.

APPEAL by defendant under G.S. 7A-27 (a) from Winner, S. J., 3 December 1973 Special Session of the Superior Court of ALAMANCE, docketed and argued at the Spring Term 1974 as Case No. 83.

Defendant was tried upon an indictment, drawn under G.S. 15-144, which charged him with the murder of Howard Langley on 11 August 1973. Both the State and defendant offered evidence. The State's evidence tended to show the facts summarized below.

The deceased, Howard Langley (Langley), owned and operated the Farmer's Drive-In, a restaurant located on High-

State v. White

way No. 87 about nine miles south of Graham. About 6:00 p.m. on 11 August 1973 defendant came into the Drive-In carrying a small child. He proceeded to the counter, which was approximately 32 feet directly back from the entrance. Langley, who was behind the counter, noticed that defendant appeared to stagger as he approached. When defendant sat down on a stool and ordered a beer, Langley told him he did not think he needed one. Defendant denied that he was drunk and said he had staggered because he was carrying the child. Langley served him the beer. Thereafter, Langley played with the baby and engaged in a laughing conversation with defendant.

Soon defendant "ordered three draft beers and two hotdogs to go." Mrs. Langley, who worked with her husband in the restaurant, prepared the hot dogs. She handed them to defendant, and returned to the kitchen, directly behind the counter. Defendant asked Langley the price of the hot dogs and the reply was "seventy-three cents." Defendant retorted that "he did not want to buy a cow, just two hotdogs." Then "one word led to another."

Their loud voices brought Mrs. Langley from the kitchen in time to hear her husband say that he had never cheated a man as long as he had been in business and he would not start now. Defendant said he would pay for the hot dogs but Langley said, "No, I will keep my hotdogs and you keep your money." Defendant's response was, "What is the matter, whitey, isn't my money good enough for you?" Langley replied that "this" had nothing whatsoever to do with it and he would like for him to leave. When defendant got off the stool "yelling and swearing" at Langley, a black woman came from a booth near the entrance and said to him, "Come on; let's go." She attempted to pull him toward the door. He "pulled back from her," but she finally got him out of the door.

At the door defendant called to Langley to "come on out." Mrs. Langley restrained her husband and defendant said, "You s. o. b. I will be back; I will get you."

Defendant left in a car with the woman who had pulled him out of the door. She returned in about ten minutes and went to a booth where the child, another black woman, and a black male were sitting. Mrs. Langley heard her tell the black man in the booth that defendant had gone to get a shotgun and was coming back. Upon hearing this all the occupants of the booth left. Mrs. Langley called the sheriff, and Langley locked the door.

State v. White

However, in about 20-25 minutes, "thinking that the other colored man would stop him and that defendant would not come back," Langley unlocked the door. Minutes later, at about 7:00 p.m., defendant entered the restaurant holding a double barrel shotgun, pointed to the floor.

At that time Mrs. Langley was behind the counter and Langley was in the kitchen behind her. When defendant said, "Where is that white son of a bitch? I came to kill him," Langley emerged from the kitchen. He told his wife "to go back," and started to the storeroom, which opened into the dining room at the south end of the counter. His double barrel shotgun was in a corner of the storeroom by the deep freeze. Defendant fired at Langley from about the center of the dining area when Langley was between the kitchen and the door to the storeroom. At that time he had not reached his gun. As Langley was falling he managed to reach into the storeroom and get his shotgun. Holding onto the storeroom door he fired and defendant fired.

The witnesses all agreed that three shots were fired in all, two in rapid succession, and that two of the three shots were fired by defendant. They did not agree (some were uncertain) whether the shot Langley fired as he was falling was the second or third shot which was fired. When Langley fired at defendant, it looked to one of the patrons seated in the restaurant "like it kind of dazed defendant a little bit." He turned around with the barrel toward them and that nearly "scared them to death."

For a moment thereafter defendant remained standing on the spot from which he had been shooting. Langley had fallen backward into the storeroom. Looking at him defendant said, "I told you I would be back and now I have got you." With that he left the restaurant and drove away in his old Chevrolet truck.

A deputy sheriff arrived at the Drive-In at 7:12 p.m. Langley was still alive but bleeding profusely. He was immediately sent to the county hospital but was dead on arrival. An autopsy revealed that he bled to death from gunshot wounds which had lacerated the jugular vein.

Shortly after defendant drove away from the restaurant the officers found him at the county hospital being treated for gunshot wounds. They also found Mr. and Mrs. W. H. Hilliard, who had been eating supper at the Drive-In. At the time of the shooting defendant had been standing in front of their booth.

State v. White

Both Mr. and Mrs. Hilliard had received gunshot wounds in the legs.

Defendant, testifying as a witness in his own behalf, gave evidence which tends to show:

He and several companions began drinking before noon on 11 August 1973 and, after 2-3 hours and 4-5 drinks, he was "high." Thereafter he went to the home of Hattie Morrow and from there he, she, and her three children went to the Farmer's Drive-In, where he ordered a beer. At that time he was still "feeling what he had drunk," but when Langley told him he was high he said he had "stumbled from taking the baby and that was all that was said." After drinking the beer and paying for it, he took the baby away from the counter and returned to order two hot dogs without asking the price. He didn't care what they cost because he had the money to pay for them. He never said anything to Langley with reference to the price of hot dogs, but he did remark to his friend, Ray Morrow (a cousin of Hattie's), that all meat was high — hot dogs, hamburger, and steak.

Mr. Langley, overhearing and misinterpreting his remarks, "snatched the hotdogs his wife had set in front of defendant," told him he did not have to buy "a damn thing" and "to get the hell out of his place." Defendant offered to pay for the hot dogs more than once and told Langley he was sorry about the whole thing. Langley refused to accept his apology and kept saying, "You get the hell out of here." Defendant, however, did not say a word back to him or raise his voice. He left peacefully, without resisting Hattie, and went back to her house. En route he did not tell her was going to get his gun and kill Langley.

When defendant got out of Hattie's car he went to M. C. Morrow's trailer where "some of the boys" advised him not to go back to the Drive-In "because that man will shoot you." However, he decided to go back and tell Langley he wasn't talking to him about the hot dogs. He got in his truck and drove first to the home of his employer, Mr. Harrelson, whom he hoped "would go talk to Mr. Langley for him." Not finding Harrelson at home, defendant and his first cousin, Jerry White, returned to the Drive-In. There defendant took his shotgun from under the seat of his truck (where he had previously put it in order to get the stock repaired). He took the gun into the restaurant with him, not because he intended to hurt anybody but because he "just felt safer carrying it in. With it he thought Langley might listen to him; he had not listened previously."

---

State v. White

---

Defendant entered the Drive-In carrying the gun down beside his leg, with the barrel pointing toward the ceiling. He made no inquiry as to Langley's whereabouts and made no threats; he had no intention of hurting anyone. However, after he had taken a couple of steps into the restaurant he got shot in the left leg, the thigh, and the side. He fell but managed to prop himself on his gun. He felt a burning and stinging and could not see very well. His only thought was to regain his balance and get out, but when he looked up he saw "a flare or something move and his first thought was that he would be shot again and he shot." He did not raise his gun until he got hit. He does not know how many shots he fired. He remembers shooting at Mr. Langley once, and he remembers going out the door. Thereafter his mind is a blank until "he was in Chapel Hill hospital."

Defendant was removed from the Alamance County Hospital to the North Carolina Memorial Hospital at Chapel Hill for surgery to repair pellet wounds in his abdomen, left knee, and right thigh. A member of the surgical team, who operated on defendant, testified that at the time he received these wounds defendant suffered intense pain. After six weeks in the hospital defendant had recovered satisfactorily.

Other witnesses for defendant included Hattie Morrow, Ray Morrow, Jerry White, Ricky Garner, and Douglas Durham.

Hattie Morrow's testimony corroborated that of defendant. She also testified that, after taking defendant to her home, she returned to the Drive-In to get "her cousin, her baby, and several more of the girls" who went with her to the restaurant. She denied that she told Ray Morrow, who went to the Drive-In with her group and remained there during the time she was away, or anyone else, that defendant was coming back with a gun. She had "no idea" that he intended to return there. He was at Harrelson's when she started on her return trip to the Drive-In, and she did not see him again until after he had been shot. He was then in his truck in front of her cousin's home, and she had the boys put him in her car so that she could take him to the county hospital.

Ray Morrow's testimony corroborated both defendant and Hattie. Jerry White testified that he declined to go into the Drive-In with defendant because he had the gun; that he heard three shots after defendant "had time to get about four steps

in the door." He "heard one and then two"; the last two being one after the other.

Ricky Garner testified that he arrived at the Drive-In on the evening of 11 August 1973 just as defendant was leaving (the first time). At that time he was cursing loudly and saying that he would be back. Garner was having a hamburger and beer when defendant returned about twenty-five minutes later with a gun in his hand and asked where Langley was.

Douglas Durham, another patron, said that he was in the restaurant from 4:00 p.m. until 8:00 p.m.; that he saw defendant the first time he came to the restaurant and he saw him leave. During the time defendant was there he heard no argument, yelling, cursing or threats. When, in about twenty-five minutes, defendant returned to the Drive-In with a gun, Durham "hit the floor" because he was scared of the gun and did not know what defendant was going to do.

In addition to the foregoing testimony defendant offered testimony tending to show that his character was good.

Judge Winner instructed the jury to return one of four verdicts: Guilty of murder in the first degree, guilty of murder in the second degree, guilty of voluntary manslaughter, or not guilty. He instructed the jury upon the law pertaining to self-defense and a killing in the heat of sudden passion. The jury's verdict was "guilty of murder in the first degree." From the sentence of death imposed upon that verdict defendant appeals to this Court.

Additional facts pertinent to decision will be stated in the opinion.

*Robert Morgan, Attorney General, William B. Ray, Assistant Attorney General, John Morgan, Associate Attorney, for the State.*

*Thomas V. Aldridge, Jr., for defendant appellant.*

SHARP, Chief Justice.

In his brief appellant purports to bring forward twenty assignments of error, none of which comply with Rule 28 of the Rules of Practice in the Supreme Court, 254 N.C. 783, 810. This rule requires that appellant's brief "shall contain, properly numbered, the several grounds of exception and assignment of

error *with reference to printed pages of transcript* and the authorities relied on classified under each assignment." (Emphasis added.) However, because this is a capital case, aided by the diligence of the members of the Attorney General's staff who prepared the State's brief and gave us the references which defendant's counsel omitted, we have considered each assignment of error. However, we deem it necessary to note only four.

[1] Defendant's assignments of error 21 and 22, that the State's evidence "was not sufficient to carry the case to the jury and further that the evidence was not sufficient to support the submission of the capital charge of first degree murder to the jury," are overruled. The resume of the evidence at the beginning of this opinion clearly demonstrates its sufficiency to withstand all motions for nonsuit, and itself eliminates the necessity of any discussion.

[4] At the close of the evidence the solicitor for the State made the opening argument to the jury. He was followed by defendant's two lawyers. Mr. Harold Dodge, counsel privately employed to assist solicitor, made the final argument. In it he said: " . . . you will answer the question whether this defendant is guilty of first degree murder. If found guilty, he gets an automatic appeal to the Supreme Court of North Carolina—it is necessary. If any error is made in this court, that Court will say."

Counsel for defendant objected immediately, and the court summarily disposed of the objection by saying, "Sustained. Members of the jury, don't consider what he said about the Supreme Court."

As soon as Mr. Dodge concluded his argument defense counsel moved the court to declare a mistrial for prejudice to defendant from the prosecution's argument that the jury verdict in this case was not final. The court denied the motion. At the beginning of his charge the judge instructed the jury as follows:

"I want to go back to the argument that was objected to in the argument of counsel that the Supreme Court has a right to send this case back on mistakes. The reason I sustained that objection, I want you all to understand is that the Supreme Court will review this case. That they would only send the case back if I make a mistake on a legal question. They will not

review the decisions of the facts by the jury. The jury is the sole trier of the facts of this lawsuit."

No further instruction was given with reference to Mr. Dodge's argument, which is defendant's assignment of error No. 24.

[2]  This Court has consistently held that, in a capital case, any argument made by the solicitor, or by private prosecution appearing for the State, which suggests to the jury that they can depend upon either judicial or executive review to correct any errors in their verdict, and to share their responsibility for it, is an abuse of privilege and prejudicial to the defendant. See State v. Hines, Walston & Brown, 286 N.C. 377, 211 S.E. 2d 201, in which Justice Branch collects the authorities which fully explain the reasons for the rule.

[3]  When such an argument is made it is counsel's duty "to make timely objection [as defense counsel did in this case] so that the judge may correct the transgression by instructing the jury." State v. Hawley, 229 N.C. 167, 170, 48 S.E. 2d 35, 37 (1948). However, in a death case intimations by counsel for the State that a jury's verdict is not necessarily a final disposition of the case are so prejudicial that counsel's failure to make timely objection will not waive defendant's right to object. State v. Dockery, 238 N.C. 222, 77 S.E. 2d 664 (1953). It is the duty of the trial judge to correct such an abuse at some time in the trial "and, if the impropriety be gross, it is the duty of the judge to interfere at once." State v. Little, 228 N.C. 417, 421, 45 S.E. 2d 542, 545 (1947).

In each of the three cases cited immediately above a new trial was awarded because the solicitor, or private prosecution argued that the jury's verdict was not the end of the case; that others would review their verdict before the sentence was executed.

In both Little and Dockery the Court expressed doubt that the court could have given an instruction that would have removed the harmful effect of the improper remarks from the minds of the jury. In Hawley the Court said flatly that no instruction could have neutralized the harmful effect of the solicitor's argument that before the defendant would be put to death the Supreme Court, the Commissioner of Paroles, and in all probability the Governor personally, would carefully consider

the case; and that, in any event, "only a certain percentage" of capital felons finally suffered death.

Private prosecution's argument in this case did not go as far as the solicitor's went in *Hawley,* yet it was clearly intended to overcome the jurors' natural reluctance to render a verdict of guilty of murder in the first degree by diluting their responsibility for its consequences. We cannot, of course, say whether its harmful effects could have been removed by an immediate and positive instruction to the jury that counsel's argument was improper; that neither the Supreme Court nor any other government agency could share their responsibility for their verdict; and that their duty required them to weigh the evidence and find the facts on the assumption that whatever verdict they rendered would be the final disposition of the case. Such instructions would have been the minimum requirement, and they were not given.

[4]   When objection was made to the argument the court merely said, "Sustained. Members of the Jury don't consider what he said about the Supreme Court." Clearly this instruction was inadequate to "correct the transgression." Later, at the beginning of his charge the judge said, "The reason I sustained that objection, I want you all to understand is that the Supreme Court will review this case. That they would only send the case back if I make a mistake on a legal question. They will not review the decisions of the facts by the jury. The jury is the sole trier of the facts of this lawsuit." This instruction was likewise inadequate.

It is quite true that on appeal this Court considers only questions of law, yet we apprehend that the foregoing instruction did not fully enlighten the jury as to the nature of the Supreme Court's review of a case on appeal and as to the difference between "triers of the facts" and judges of the law. They did understand, however, the Supreme Court would "review the case," for both the judge and counsel had told them so. Futhermore, by his positive statement that "the Supreme Court will review this case," the jury was bound to have understood that the court assumed their verdict would be guilty.

For the errors embraced in assignment No. 24, we hold that defendant is entitled to a new trial. Our decision on this assignment is bolstered by the following and final episode of the trial.

The jury returned its verdict on 6 December 1973, and the court pronounced judgment. Following the recess of the court

State v. White

that afternoon Mrs. E. R. Larzelere, a member of the panel of jurors summoned for the term, but not a member of the jury which tried defendant, reported the incident detailed below, and one other, to defense counsel:

Mrs. Larzelere was seated in the courtroom when the verdict in this case was returned. When the jurors were discharged and directed to take seats in the courtroom, one of the jurors took a seat behind her. As he sat down she heard him say, "They always take it to the Supreme Court." She did not see the juror who made that statement, but, in her opinion, it was the foreman of defendant's jury.

Counsel told the court what Mrs. Larzelere had told him and moved to set aside the verdict on the grounds of "jury misconduct." Judge Winner "accepted" Mrs. Larzelere's affidavit in which she swore to the facts she had reported, but he denied defendant's motion for a new trial, because "there is nothing in either of those instances that is prejudicial to defendant." We argee that, standing alone, the juror's comment, "They always take it to the Supreme Court," would not justify a new trial. It does, however, indicate to us that one or more of the jurors did consider what counsel "said about the Supreme Court."

[5] Since the case goes back, we consider defendant's assignment of error No. 9. For the purpose of showing bias on the part of Mrs. Langley, the widow of the deceased, who testified for the State as an eyewitness to the homicide, defense counsel asked her on cross-examination, "Have you privately employed counsel to prosecute this case for you?" The court sustained the State's objection to the question. Had she been permitted to answer, Mrs. Langley would have said, "Yes, I did."

A party to either a civil or criminal proceeding may elicit from an opposing witness on cross-examination particular facts having a logical tendency to show that the witness is biased against him, hostile to his cause, or that the witness is interested adversely to him in the outcome of the litigation. Ordinarily, it is prejudicial error to prevent cross-examination of a witness as to facts from which bias would clearly be inferred. *State v. Hart,* 239 N.C. 709, 711, 80 S.E. 2d 901 (1954). Indisputably, the fact that a witness had employed private counsel to prosecute the case against defendant has a logical tendency to show the witness' bias against him. "[H]ostility toward a party may be shown by the fact that the witness has . . . em-

ployed special counsel to aid in prosecuting the party." McCormick on Evidence § 40 (1972). *See* 98 C.J.S., *Witnesses* § 552 (1957).

The court erred in excluding the evidence that Mrs. Langley had employed private prosecution in this case. However, decision on assignment No. 24 makes it unnecessary to decide whether this error was prejudicial in this case. Other of defendant's assignments of error have merit but, since we deem none of them likely to reoccur at the next trial, we omit discussion of them.

New trial.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.

Justice LAKE concurring in result.

It is my opinion that a new trial must be had in this case but not for the reason upon which the majority opinion rests.

After the jury had begun its deliberations, which it did later than 5 p.m. on December 5, the jury returned to the courtroom with a request for further instructions as to the elements of the crime of first degree murder. The judge stated that because of the late hour, he would not explain the law relating to that matter at that time but would do so "the first thing in the morning" and would let the jury go in the meantime. He specifically instructed the jury: "Be careful and observe all the instructions I gave you the first of the week, do not talk about the case. Let me caution you again, not to discuss this case even among yourselves until you are back here tomorrow and back in the jury room."

The trial resumed at 9 a.m. on December 6, at which time the court, in response to the request of the jury, instructed the jury as to the elements of first degree murder and second degree murder and, thereupon, sent the jury to its room to resume its deliberations. The jury returned with its verdict of guilty of murder in the first degree and, upon that verdict, the court sentenced the defendant to death.

On the following day, December 7, before the end of the term, the defendant made a motion that the judgment be vacated and a new trial granted because of misconduct of one or more of the jurors. The alleged misconduct had been brought to the

State v. White

attention of counsel for the defendant, after the imposition of sentence, by Mrs. W. R. Larzelere who was on the jury panel for the term but was not a member of the jury which tried this defendant. Her affidavit, which was submitted to the court in support of the motion, stated:

"That when this Affiant arrived at the Courthouse on the morning of December 6, 1973, she proceeded to the hallway immediately to the rear of the Courtroom where the Harold Gerome White Case was being tried and between 8:30 and 9:00 o'clock a.m. there observed several individuals at least three in number, and recognized at least one of said individuals as a juror on the Harold Gerome White Case. That as Affiant approached this group she commented about climbing the stairs and proceeded toward the Courtroom door when the said individuals there talking to each other were overheard by her as discussing the trial, and this Affiant commented that she had not been present for all the testimony but there seemed to her to be contradictions in the testimony, whereupon the white male in said group which this Affiant recognized as a juror on the White Case stated very emphatically that he had heard all the evidence and that it was an open and shut case of murder."

The court thereupon had Mrs. Larzelere duly sworn. She testified that she did not know whether the group she observed talking about the case contained more than one of the jurors serving on that case but "there were at least two other men out there" and they were talking when she came up, "discussing this case." She testified that she informed the group that she thought there was some "controversy in the testimony" but that she had not heard all of the testimony and, thereupon, the foreman of the jury made the statement that he thought it was an open and shut case of murder.

Although the foreman of the jury, thus accused of impropriety by Mrs. Larzelere, was present in the courtroom and was identified therein by her as the man she had heard making the statement in question, the court did not see fit to call him as a witness and interrogate him about the matter, simply stating that there was nothing in the incident that was prejudicial to the defendant and, therefore, denied the motion for a new trial.

It is obvious that Mrs. Larzelere, on her own testimony, was guilty of gross misconduct in discussing the case with at least one

State v. White

person known by her to be a juror in the case. For this misconduct she, herself, could well have been cited for contempt of court but no such action was taken.

Taking the testimony and the affidavit of Mrs. Larzelere as true, which under the circumstances we must do, the foreman of the jury clearly violated the proper instructions given the jury by the court at adjournment on December 5. He not only stated his own conclusion as to the defendant's guilt prior to the final instructions of the court, but he engaged in "dicussing this case" with other persons who may or may not have been members of the jury. The nature of their discussion concerning the case is not known. We cannot, upon this record, determine whether that discussion was prejudicial to the defendant or not. A verdict of guilty in a capital case should not be allowed to stand as support for a death sentence under these circumstances, though, ordinarily, the granting of a mistrial for misconduct of this sort rests in the sound discretion of the trial judge. See, *State v. Shedd,* 274 N.C. 95, 103, 161 S.E. 2d 477. The trial judge, in my opinion, should have vacated this judgment, set aside the verdict and ordered a new trial.

I agree with both the majority opinion and with the dissenting opinion of Justice Huskins concerning the alleged comment by the foreman after the jury returned to the courtroom following the verdict and was discharged. That comment was not prejudicial to the defendant and did not disclose any impropriety by the jury or any consideration by the jury of any improper or irrelevant matter.

I am unable to agree with the majority concerning the steps taken by the trial judge to correct the improper statement by counsel for the private prosecution in his argument to the jury. As to that matter, I am in agreement with the dissenting opinion of Justice Huskins.

In his argument, counsel for the private prosecution told the jury:

"You will answer the question whether this Defendant is guilty of First Degree Murder. *If found guilty,* he gets an automatic appeal to the Supreme Court of North Carolina— it is necessary. If any error is made in this Court, that Court will say." (Emphasis added.)

That argument was improper because it tended to minimize the importance of the jury's verdict and from it the jury might

infer that its verdict would be reviewed by the Supreme Court. See, *State v. Hawley,* 229 N.C. 167, 48 S.E. 2d 35, and *State v. Little,* 228 N.C. 417, 45 S.E. 2d 542, in each of which the argument of the solicitor was substantially more objectionable than in the present case. Upon prompt objection by counsel for the defendant, the trial judge responded:

> "SUSTAINED, Members of the Jury, don't consider what he said about the Supreme Court."

The foregoing statement apparently occurred at the very end of the concluding argument to the jury. The defendant's counsel thereupon moved for a mistrial, which the court denied. The court then asked, "Do you want me to instruct them not to consider it again, or not?" Counsel for the defendant replied, "Without prejudice to the defendant on its motion for mistrial, we ask the Court to instruct the jury as to the proper law." It does not appear that these remarks were in the hearing of the jury. The court immediately began its instructions to the jury and opened its charge with this statement:

> "Members of the Jury, I want to go back to the argument that was objected to in the argument of counsel that the Supreme Court has a right to send this case back on mistakes. The reason I sustained that objection, I want you to understand is that the Supreme Court will review this case. That they would only send the case back if I make a mistake on a legal question. *They will not review the decisions of the facts by the jury. The jury is the sole trier of the facts of this lawsuit.*" (Emphasis added.)

To say that this is an expression of opinion by the trial court that the jury would (or should) return a verdict of guilty is, in my opinion, a very strained construction of what the judge said. Only a few moments before, the argument in question had been made to the jury and, in view of the resulting flurry of excitement, it is reasonable to suppose that the jury remembered that, whatever it may have remembered about the rest of counsel's argument. That statement was, *"If found guilty,* he gets an automatic appeal." (Emphasis added.) In the remainder of the charge, the trial court clearly instructed the jury as to the burden of proof and as to the elements which the State must prove beyond a reasonable doubt in order to justify a verdict of guilty.

In my opinion, the sum total of the argument of counsel, the objection, the ruling of the court thereon and the instruction of

the court with reference thereto was not prejudicial to the defendant. Had none of this occurred, it is entirely possible that the jurors might have gone into their deliberations under the impression that their verdict could be reviewed on appeal. In view of all that had been written and said in the press and upon other news media in recent years concerning the death penalty and the appeals from judgments imposing sentences of death, it is probable that any jury in North Carolina would be aware of the likelihood of an appeal from a sentence of death and, in absence of some instruction thereon, the jury might well be confused as to the scope of such appeal. The argument of counsel for the private prosecution was improper and ill advised. Had it not been corrected, it would have been ground for a new trial, but, in my opinion, the trial judge corrected it clearly and effectively. It was made perfectly clear to the jury that the jury and not the appellate court was the final voice on the question of guilt or innocence. I see no error in the ruling or the instruction of the trial judge concerning this argument.

Justice HUSKINS dissenting.

The evidence recited in the majority opinion provides overwhelming support for the verdict returned by the jury. Thus, unless prejudicial error is made to appear, the verdict should be upheld.

In my view, the error relied on by the majority is inflated all out of proportion to its actual significance. Granted that Mr. Dodge, the privately employed prosecutor, erred when he argued to the jury: " . . . you will answer the question whether this defendant is guilty of first degree murder. If found guilty, he gets an automatic appeal to the Supreme Court of North Carolina—it is necessary. If any error is made in this court; that Court will say." Upon objection the able and conscientious trial judge immediately said: "Sustained. Members of the jury, don't consider what he said about the Supreme Court." This was sufficient, in my opinion, to remove any harmful effect the mildly improper argument of counsel might have had. But the judge went further and at the beginning of his charge to the jury stated: "I want to go back to the argument that was objected to in the argument of counsel that the Supreme Court has a right to send this case back on mistakes. The reason I sustained that objection, I want you all to understand is that the Supreme Court will review this case. That they would only send the case back if I make a mistake on a legal question. *They will not re-*

---

State v. White

---

*view the decisions of the facts by the jury.* The jury is the sole trier of the facts of this lawsuit." (Emphasis added.) While this instruction is not a model of good grammar or sentence structure and does not depict the wisest choice of words, it nevertheless informs the jury in understandable language that a review by the Supreme Court would entail only an examination of the case for errors of law, not errors of fact—"they will not review the decisions of the facts by the jury." Thus it seems to me that any prejudicial effect the improper argument might have had was decisively removed by the instructions of the court. I see little else the court could have done; and unless we are to say that this impropriety was so gross it could not be corrected, the effects of the episode should be regarded as cured and the conviction upheld.

Moreover, I attach no significance whatever to the report by Mrs. Larzalere that, after the jury had been discharged, she heard one of the jurors say: "They always take it to the Supreme Court." Once a jury is discharged its verdict cannot be impeached by statements, and rumors of statements, allegedly made by some of the jurors. *Selph v. Selph,* 267 N.C. 635, 148 S.E. 2d 574 (1966); *State v. Hollingsworth,* 263 N.C. 158, 139 S.E. 2d 235 (1964); 7 Strong's N. C. Index 2d, Trial § 46 (1968).

I am in thorough agreement with the majority holding that defendant should have been permitted to cross-examine Mrs. Langley with reference to her employment of private counsel. This evidence was competent to show bias on the part of Mrs. Langley, and the rule to that effect is so generally recognized as to require no citation of authority. Even so, defendant was on trial for killing Mrs. Langley's husband who was shot down before her eyes, and every member of the jury knew she was bitterly biased against defendant and intensely interested in seeing him convicted. Hence exclusion of evidence that she had employed counsel to assist the prosecution was harmless beyond a reasonable doubt. *Schneble v. Florida,* 405 U.S. 427, 31 L.Ed. 2d 340, 92 S.Ct. 1056 (1972); *Harrington v. California,* 395 U.S. 250, 23 L.Ed. 2d 284, 89 S.Ct. 1726 (1969); *Fahy v. Connecticut,* 375 U.S. 85, 11 L.Ed. 2d 171, 84 S.Ct. 229 (1963); *State v. Taylor,* 280 N.C. 273, 185 S.E. 2d 677 (1972); *State v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398 (1970).

For the reasons stated I respectfully dissent from the majority opinion granting a new trial. I vote to uphold the conviction.