STATE OF NORTH CAROLINA v. THURMAN LEE STRICKLAND

No. 60

(Filed 17 June 1976)

1. **Homicide § 21— premeditation and deliberation — sufficiency of evidence**

    The evidence was sufficient to support a jury verdict that defendant killed his mother and grandmother with premeditation and deliberation where it would support findings by the jury that defendant told the occupants of his grandmother's house a fabricated story that his son had been kidnapped by masked men and that in order to get his son back he had been instructed to bind the occupants so that the masked men could rob them, defendant had previously purchased handcuffs and restraining straps, defendant placed handcuffs and straps on a handyman who was in the house and attempted to suffocate him by placing a plastic bag on his head, the handyman heard defendant's mother pleading with defendant to call the law and defendant reply that he had "done gone too far," defendant placed handcuffs on his mother and grandmother, defendant thereafter suffocated his grandmother with a pillow and shot and killed his mother, and defendant left a note to his girl friend stating that he knew she would not understand and that he thought "this might be a way out."

2. **Assault and Battery § 14— assault with deadly weapon with intent to kill — placing plastic bag over head**

    The State's evidence was sufficient for the jury in a prosecution for assault with a deadly weapon with intent to kill where it tended to show that defendant placed a plastic bag over the victim's head and taped it around the victim's neck with the intent to suffocate the victim while his hands were handcuffed behind him.

State v. Strickland

3. **Criminal Law § 102— time since use of death penalty — remark by district attorney during jury selection**

In this prosecution for first degree murder, the district attorney's remark during jury selection that "nobody has died in the death chamber since 1961" did not constitute prejudicial error where (1) the district attorney was countering a prospective juror's statement that the death penalty was applied unfairly so as to discriminate against blacks and the poor, (2) the clear import of the district attorney's statement was that there had been no recent discriminatory use of the death penalty in North Carolina because it has not been used at all in this State in thirteen years, and (3) there was no implied suggestion that the death penalty would not be applied in the future or to a particular defendant on trial; furthermore, defendant waived his right to object to the remark by his failure to object at trial.

4. **Criminal Law § 75— non-custodial questioning — absence of Miranda warnings — admissibility of statements**

The evidence on *voir dire* supported the trial court's determination that defendant was not in custody when he was questioned by an officer at a hospital where he had been taken by ambulance for treatment of a bullet wound; therefore, the *Miranda* warnings and accompanying waivers were not required as a prerequisite to the admissibility of defendant's statements to the officer.

5. **Constitutional Law § 36— death penalty — constitutionality**

It was not error for the trial judge to enter judgments of death upon defendant's conviction in two cases of first degree murder.

Chief Justice SHARP and Justices COPELAND and EXUM dissent as to death sentence.

ON *writ of certiorari* to the Superior Court of ONSLOW County pursuant to General Statute 7A-32(b). Thurman Lee Strickland was tried at the June 24, 1974 Session of Onslow Superior Court on two indictments charging the murders of Thelma Strickland and Addie Letson, and an indictment charging an assault on one William Chappell with a deadly weapon with intent to kill, all allegedly occurring on February 20, 1974. He was found guilty on all charges, sentenced to death in each murder case and to eight years imprisonment in the assault case. His appeal was not perfected in time. A writ of certiorari was sought and allowed by this Court on June 2, 1975. Defendant's motion to bypass the Court of Appeals in the assault case was allowed on June 4, 1975. This case was docketed and argued as No. 25 at the Fall Term 1975.

The State's evidence may be summarized as follows: Defendant was a vacuum cleaner salesman who lived in Goldsboro.

State v. Strickland

In the afternoon or evening of February 19, 1974, defendant telephoned the deceased Addie Letson's home in Quail Haven, Onslow County, and left a message with Chappell that he would come there late that evening with his employer to spend the night. Defendant's employer never made any such arrangement with defendant nor was such an arrangement usual. Addie Letson was defendant's grandmother. The deceased, Thelma Strickland, defendant's mother, and the daughter of Mrs. Letson, was living temporarily with Mrs. Letson at this time and was present in the Letson home. Also living in the Letson home was the victim Chappell, a long time helper and handyman of Mrs. Letson.

Defendant, separated from his wife, spent the evening of February 19 until 11:15 p.m. at his girl friend's home in Goldsboro. He arrived at Mrs. Letson's home about 1:00 a.m. on February 20 carrying in his hand a brown paper sack. Defendant, his mother, grandmother, and Chappell, watched television until 2:30 a.m.

At that time, defendant told them all: His son, Lee, who generally lived with defendant's estranged wife in Garner, but who had been recently living with defendant, had been kidnapped by two masked men. These men had accosted defendant and Lee at defendant's home in Goldsboro and forced him and his son to drive to defendant's trailer on Emerald Isle where they now held the boy. In order to get the child back he had been instructed by these men to bind, gag, and blindfold all three occupants of the Letson home. The kidnappers would appear at 3:00 a.m., bring the boy Lee and take money from the home.

Defendant then proceeded, with Chappell's cooperation, to handcuff Chappell from the rear, place restraining straps loosely around his ankles, and put Chappell on his bed in his bedroom. Later Chappell heard the two women talk about hiding their money and rings. They were in the front part of the house and handcuffed. Chappell could hear but not see what occurred. He heard the two women ask defendant on several occasions to call law enforcement officers. Twice he heard defendant speak as if he were calling the Sheriff's office requesting assistance.

Shortly before 6:00 a.m. defendant returned to Chappell's room, taped his lips, placed a plastic bag over his head and taped it around his neck so tightly that Chappell could not

breathe. He advised Chappell that the kidnappers would not be there until 6:00 a.m. Defendant left. Chappell was able to remove the bag from his head by rubbing it against the bedposts and was able to release his leg straps. He was still handcuffed from the rear.

Chappell heard Thelma Strickland pleading with defendant to call the law. Defendant said, "Ma, I've done gone too far." Chappell also heard someone say, "do not put that pillow on her, you know she can't stand it." At that point Chappell managed to escape and ran to a neighbor's house. The Sheriff was called from this house at 6:53 a.m. When sheriff's deputies arrived they did not go in immediately but observed the house as they waited for assistance. They saw no one enter or leave the house. One deputy heard a shot. They saw the dining room door open and heard a woman's voice call for help. As they approached the house defendant was found lying in the driveway with a superficial bullet wound in his thigh. He said his mother and grandmother were dead and that masked men who had just left in a big car had shot at the deputies. No one to the knowledge of the deputies had shot at them. They had not seen a car leaving the premises.

The body of Mrs. Letson was found face down on her daughter's bed with her hands cuffed behind her. The cause of her death was suffocation. The body of Mrs. Strickland was found dead in the den. She had been shot five times with a .22 caliber weapon in the head, neck, chest and abdomen. She was handcuffed from the front. A pillow was found nearby in which there was a bullet hole and powder burns. The cause of her death was a gunshot wound to the head. Defendant's .22 pistol was found in the den with six empty cartridges. A loaded .32 pistol was also found. At least two of the bullets found in Mrs. Strickland and the bullet in defendant's thigh had come from defendant's weapon.

There was further evidence that no person or vehicle had gone to defendant's trailer at Emerald Isle during the evening or early morning of February 19-20, and that defendant's son was never kidnapped.

The State introduced two statements given by defendant to police officer Woodward which, broadly, were similar to his testimony at trial but inconsistent therewith in some important details. Two statements made to defendant's aunt while defend-

State v. Strickland

ant was in jail were also admitted without objection. They, likewise, were, broadly speaking, similar to his trial testimony but again incomplete or inconsistent therewith in some important details.

Defendant offered evidence which may be summarized as follows: He had a reputation for being a person of good character in his community. On the evening of February 19 he reached his home in Goldsboro about 11:15 p.m., having come from his girl friend's home. The doorbell rang. A masked man wielding a pistol appeared and claimed to have kidnapped his son Lee. The masked man collected three sets of handcuffs from defendant's kitchen table, some plastic bags from the kitchen cabinet, and some restraining straps from the kitchen counter. Defendant said he had bought the handcuffs earlier that afternoon for the purpose of locking the gate to his home and the restraining straps to secure a trailer tarpaulin and some camping equipment.

They got in defendant's car. A second masked man was in the back seat of this car. Defendant was instructed to and did drive to his trailer at Emerald Isle, where he was told his son would be. Upon arrival there his son was not present. Defendant was then instructed to go to his grandmother's house and bind, gag and blindfold the occupants. His abductors told him they would appear about 6:00 a.m. to rob the occupants of whatever money was available.

From the time of defendant's arrival at his grandmother's home defendant's testimony roughly parallels the State's evidence until he put the plastic bag on Chappell's head. Defendant claimed he placed the bag on loosely so that Chappell could breathe. He testified further that after handcuffing and otherwise binding Chappell, his grandmother, and his mother, he determined to shoot it out alone with the masked men after he got his son. At 6:00 a.m. he looked out and saw a car drive by. He then wrote a note to his girl friend which said, "Denise, I know you won't understand but I love you so much. I thought this might be a way out. Time is out. Thurman."

He then went out the door trying to find a vantage point outside the house from which to meet the men. No place seemed right. When he came back in the house a man suddenly came from behind a bar toward him, struck him, took his .22 pistol and threw his grandmother's .32 pistol on a desk. He was pushed

into his mother's bedroom and saw her at the foot of the bed. She said, "Where is Lee?" His grandmother stood up; a second masked man stood up and grabbed her. He was carried into the living room. He heard his mother call out his name and a voice say "Don't do that." Out the window defendant saw a sheriff's car pass. The masked man released him and went back in the den. Defendant heard several shots. Defendant ran back into the bedroom. In a struggle over a gun defendant was shot in his thigh. He looked and saw his grandmother dead. Defendant called Swansboro police officers on the phone. While on the phone he saw his mother sitting in a chair and she would not respond. He crawled out the door and yelled for help. Two officers approached and rendered assistance.

Defendant admitted telephoning the Letson home on February 19, but testified that he talked with his mother and advised her only that he might drop by late that evening. He denied mentioning that his boss would be with him. He testified further that he initially told the occupants of the Letson home the kidnappers would be present at 3:00 a.m. rather than 6:00 a.m. in order to gain their early attention and cooperation and that he faked two telephone calls to the Sheriff's office to pacify his mother and grandmother.

*Rufus L. Edmisten, Attorney General, by James E. Magner, Jr., Assistant Attorney General, for the State.*

*Roland C. Braswell, Attorney for Defendant.*

EXUM, Justice.

I

[1] Defendant by assignment of error number 9 argues that there was insufficient evidence to carry the case to the jury on the issues of premeditation and deliberation and that the trial court erred in not allowing his motion for nonsuit on the two first degree murder charges.

In considering this assignment "we consider all of the evidence actually admitted, whether from the State or defendant, in the light most favorable to the State, resolve any contradictions and discrepancies therein in the State's favor, and give the State the benefit of all reasonable inferences from the evidence." *State v. Hankerson,* 288 N.C. 632, 636, 220 S.E. 2d 575, 580 (1975); *State v. Cutler,* 271 N.C. 379, 382, 156 S.E.

State v. Strickland

2d 679, 681 (1967). The elements of premeditation and deliberation in a first degree murder case "are not usually susceptible to direct proof, but must be established from the circumstances surrounding the homicide." *State v. Patterson,* 288 N.C. 553, 559, 220 S.E. 2d 600, 606 (1975).

Leaving aside the interesting question whether defendant's version of the facts would, even if true, have constituted a defense to the murder charges, we hold there was ample evidence from which the jury could find that defendant not only killed his mother and his grandmother but did so with premeditation and deliberation.

With regard to significant facts there were enough inconsistencies between defendant's pre-trial statements to investigating Deputy Woodward and his aunt and his testimony at trial, and even between portions of his trial testimony for the jury to conclude that defendant's bizarre tale of being under the influence of two unknown abductors was an utter fabrication designed solely to cover up his complicity in the crimes. With regard to the purchase of the handcuffs and other restraining devices, defendant first told Woodward that these devices were given to him by his abductors. In a second statement to Woodward he said he bought them the day before at a police supply store in Kinston and that both the handcuffs and the straps were purchased for the purpose of locking a chain link fence gate at his home in Goldsboro. On direct examination at trial defendant did not state clearly how he acquired these devices but left the unmistakable impression that he had been given them by his abductors. He said, "I related [to his mother, grandmother, and Chappell] that the two men had come to my house and what they had told me, what they told me I had to do. I showed them the instruments that I had been given, at that point Shorty turned and the handcuffs were placed on him and he went into the bedroom and laid down." This was defendant's only reference to his acquisition of these instruments in a lengthy direct examination which covered in great detail other aspects of the case. On cross-examination, however, he conceded that he purchased the devices in Kinston on the afternoon of February 19—the handcuffs for the purpose of locking his gate and the straps to use in securing certain camping equipment.

Despite Chappell's testimony that defendant had called the Letson home on the afternoon of February 19 to advise that he

and his boss would come in late that night, defendant omitted any discussion of this fact during his direct testimony. It was not until cross-examination on the point that he conceded that he called the house that afternoon, talked with his mother, and told her only that he would possibly be coming over between 12:00 midnight and 1:00 a.m.

Defendant's direct examination purports to cover the crucial events of February 19 before arrival at his girl friend's home with this statement: "On February 19 I worked that day. The first part of the morning I worked in the community where I lived and in the afternoon I worked over in Lenoir County. Between six and seven o'clock that evening I had gone over to [his girl friend's home]."

In defendant's first statement to Woodward he said that his masked abductors carried him directly from his home in Goldsboro to his grandmother's home in Onslow County where they instructed him to go in, bind the occupants of the home, and to await their return at 6:00 a.m. In his second statement to Woodward he said he went first to his trailer on Emerald Isle with the masked men and then from Emerald Isle to Mrs. Letson's home, apparently alone.

In his direct testimony defendant stated that his abductors indicated en route from Goldsboro to Emerald Isle that they were going to rob *him* and that it was not until the threesome arrived at Emerald Isle that he was instructed to go to his grandmother's home in Onslow County were the robbery would take place. On cross-examination, however, his testimony was that the masked men told him en route from Goldsboro to Emerald Isle that they were going to rob the occupants of his grandmother's home and what he was to do there.

In the context of other evidence already referred to the jury could well have inferred from defendant's statement to his mother, "Ma, I've done and gone too far," and from the note he left his girl friend that he was premeditating and deliberating at that time upon the killings. The jury could also have inferred that defendant began premeditating and deliberating the killings when he purchased the restraining devices on the afternoon of February 19. Neither the State nor the jury were bound to accept defendant's explanation of their purchase given either at trial or in his pre-trial statements which the State offered against him. The State is not bound by exculpatory portions of

a defendant's pre-trial statement offered against him at trial if there is "other evidence tending to throw a different light on the circumstances of the homicide." *State v. Bright,* 237 N.C. 475, 477, 75 S.E. 2d 407, 408 (1953) ; *accord, State v. Hankerson, supra.* The State's evidence as to what occurred in the early morning hours at the Letson home, given by the victim Chappell and investigating officers who arrived at the scene, together with defendant's inconsistent statements and evasiveness about the purchase itself tend to throw a different light on the circumstances of the homicide from that suggested at times by the defendant.

In short the evidence of defendant's guilt of two murders in the first degree is plenary. This assignment of error is overruled.

[2] By assignment of error number 10 defendant complains of the refusal of the trial court to allow his motion for nonsuit as to the charge of assault with a deadly weapon with intent to kill William Chappell. The indictment alleges that defendant:

> "did feloniously assault William Kenneth Chappell with a deadly weapon, to wit: a plastic bag, with the felonious intent to kill and murder the said William Kenneth Chappell, the said plastic bag being a deadly weapon by the manner of its use in that the Defendant placed the plastic bag over the head and face of William Kenneth Chappell and closed the open end of said plastic bag tightly with tape around the neck of William Kenneth Chappell, all the while the said William Kenneth Chappell's hands were handcuffed behind him."

These allegations are precisely what the evidence of the State tended to show. Chappell testified that defendant:

> "put a piece of tape each way across my mouth and he then rolled out some tape and then he put the bag over my head, and then he put the tape around the bag on my neck and he pulled up the left part of the bag and asked me if I could breathe and I said yes Thurman I can breathe, and with that he clapped it down around my neck and he went out and turned the lights off and closed the door. At that point I was still handcuffed and laying on my back.
>
>            *      *      *
>
> "At that point I was not in a position to breathe."

In light of the fact that Mrs. Letson died by suffocation this is substantial evidence from which a jury might find that defendant placed the bag over Chappell's head and "clapped it down around [his] neck" with intent to suffocate him to death. This evidence also permits the jury to find that the bag was a deadly weapon. A deadly weapon is not one which must kill but one which under the circumstances of its use is likely to cause death or great bodily harm. *State v. Smith,* 187 N.C. 469, 121 S.E. 737 (1924). This assignment is overruled.

Defendant's assignment of error number 11 refers to the trial court's "failure to grant the defendant's motion for judgment of acquittal notwithstanding the verdict." This motion is not recognized in our criminal practice. Even if it were, we suppose it would raise the same legal question as presented by defendant's motions for judgment as of nonsuit at the close of all the evidence upon which, as we have said, the trial court properly ruled against defendant. This assignment is overruled.

## II

[3] During the jury selection process the following colloquy between the district attorney and prospective juror Harvey A. Lewis occurred:

"Q. Could you sit as a juror in these cases and listen to the evidence of the witnesses and the law that the court will charge to the jury and render a fair and impartial verdict based solely and entirely upon that?

"A. I think I can. I have to qualify that statement. Since you did say that this is one that there is a possibility of capital punishment, then I feel, although I do believe in capital punishment, but under the manner in which it has been administered, I don't think it has been fair, that would be my only qualification.

"Q. You mean the manner in which it has been administered is not fair.

"A. From the statistics that those people that have been tried say for a capital crime, it seems as though the black, poor is the ones that it has been administered to more.

"Q. *Are you familiar in this state that nobody has died in the death chamber since 1961, that's thirteen years ago?* (Emphasis supplied.)

"A. Yes, I am. Because of the administration of it, I hope that North Carolina will do away with the death penalty instead life imprisonment with no chance of parole.

"Q. That might have something to do with your verdict then in this case, your feelings about it?

"A. It might. At this time, I'm not sure.

"Q. According to what you have just stated with respect to your feelings about punishment and the fact that it is done unfair and other things that you have stated, do you think it would be possible for you to sit on this jury and render a verdict in this case that would mean the death sentence?

"A. It might seem prejudice, I'm not sure.

"Q. Now there is no race involved in this case.

"A. I understand that.

"Q. This is all the same race.

"A. I wasn't talking about the racial prejudice. I'm talking about there is also the status of the defendant that might or might not enter in. I will be as fair as I can.

"MR. BRITT: I believe the State will excuse this juror."

Defendant contends that the statement by the prosecutor that "nobody has died in the death chamber since 1961" was prejudicial error, relying on *State v. Hines*, 286 N.C. 377, 211 S.E. 2d 201 (1975). A similar contention was made in *State v. Miller*, 288 N.C. 582, 220 S.E. 2d 326 (1975). In *Miller* the district attorney in closing argument told the jury that the only thing wrong with capital punishment was its lack of use and it could not be an effective deterrent to crime when no one had been executed in this State for twelve years. In that case we upheld the conviction and distinguished *Hines*. We said, 288 N.C. at 601-602, 220 S.E. 2d at 340:

"In *Hines* a prospective juror under interrogation stated she was 'not comfortable with capital punishment.' The district attorney, in the presence of all the jurors, replied: 'Well, everybody feels that way but this is the punishment that is provided at this point. *And to ease your feelings, I might say to you that no one has been put to*

*death in North Carolina since 1961.'* We held that the statement was improper and prejudicial in that it tended to dilute the solemn obligation imposed upon jurors in capital cases by leading them to believe that Hines and his co-defendants would not or might not be executed even if convicted. Such is not the import of the district attorney's remarks in this case. Here, the temper, tone and meaning of the district attorney's remarks were not likely to ease the feelings of the jury, or anyone else, regarding capital punishment. To the contrary, the prosecutor was scolding all persons connected with the administration of the criminal laws for their failure to execute those convicted of a capital crime. Rather than easing the feelings of the jury, the argument tended to emphasize the deadly seriousness of its duty. We think the challenged remarks were well within the bounds of legitimate debate."

As in *Miller,* the questioning here by the district attorney was not designed to ease the feelings of the jury as it embarked upon its serious task. The thrust of his remark was not, as it was in *Hines,* that since no one had been recently executed, perhaps the defendant on trial would likewise escape this fate. Instead the district attorney was countering prospective juror Lewis' statement that the death penalty was applied unfairly so as to discriminate against blacks and the poor. The thrust and clear import of the district attorney's statement was that there had been no recent *discriminatory* use of the death penalty in North Carolina because in fact it has not been used at all in this State for some thirteen years. There was no implied suggestion, as there was in *Hines,* that the death penalty would not be applied in the future or to the particular defendant on trial. There was consequently no error prejudicial to defendant in this incident.

We note also that defendant, again unlike the defendant in *Hines,* made no objection to the remark at trial. Had he then found it objectionable and said so, the trial judge would have then had an opportunity to inquire of those jurors who heard the remark as to what impression, if any, it made upon them and to correct such misleading impressions, if any, as may have been made. Under these circumstances defendant's failure to object waived his right to object and therefore to complain further on appeal. The general rule is that "[a]n objection not made in apt time is waived." *State v. Davis* and *State v.*

---

State v. Strickland

---

*Fish,* 284 N.C. 701, 713, 202 S.E. 2d 770, 778 (1974) ; *cf.* Rule
10 (b) (1), North Carolina Rules of Appellate Procedure, 287
N.C. 671 (1975).

Where, however, the error complained of is so prejudicial
that even upon timely objection no purported curative instruc-
tion could possibly remove the prejudicial effect, "counsel's
failure to make timely objection will not waive defendant's right
to object. *State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664
(1953)." *State v. White,* 286 N.C. 395, 403, 211 S.E. 2d 445,
450 (1975), and cases therein discussed. Although we held in
*Hines* that a mere sustaining of the objection by the trial judge
did not cure the error, this was not to say that the prejudicial
effect of the district attorney's remark in *Hines* could not have
been cured by appropriate instructions of the trial judge. Ap-
propriate curative instructions might be effective to remove
the prejudice of a *Hines* type remark. The jury could, for ex-
ample, be told that it should not interpret this kind of remark
to mean that the penalty of death may not be exacted upon its
return of a guilty verdict and that it must act upon the assump-
tion that upon its return of such a verdict the defendant will,
as a matter of law, be sentenced to die and will, as a matter of
fact, be executed in keeping with that sentence. *Cf. State v.
White, supra.*

Another exception to the waiver rule, not applicable here,
is the admission of evidence contrary to a statute which pre-
cludes its admission in furtherance of some public policy of the
State. In this instance failure to object to the evidence does not
waive one's right to have the error considered on appeal. *State
v. McCall,* 289 N.C. 570, 223 S.E. 2d 334 (1976).

In capital cases this Court has applied the waiver rule only
as an alternative ground for finding no error when, substan-
tively, no error was apparent. *State v. Shrader,* 290 N.C. 253,
225 S.E. 2d 522 (1976) ; *State v. Sanders,* 276 N.C. 598, 610, 174
S.E. 2d 487, 496 (1970), death sentence reversed 403 U.S. 948. In
keeping, however, with the now settled practice of the Court "in
every case in which a death sentence has been pronounced to ex-
amine and review the record with minute care to the end it may
affirmatively appear that all proper safeguards have been
vouchsafed the . . . accused . . . . " *State v. Fowler,* 270 N.C.
468, 469, 155 S.E. 2d 83, 84 (1967), the Court has relaxed the
waiver rule at least as regards motions to strike specific por-

tions of testimony on grounds other than those raised by a general objection to the entire testimony. *State v. Patterson,* 288 N.C. 553, 567, 220 S.E. 2d 600, 611 (1975) (no substantive error found); *State v. Fowler, supra* (substantive error ground for new trial). The Court has uniformly in capital cases overlooked failure to support alleged errors by appropriate exceptions and assignments of error in instances where no objection at trial was required. *State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80 (1975); *State v. McCoy,* 236 N.C. 121, 71 S.E. 2d 921 (1952); *State v. Herring,* 226 N.C. 213, 37 S.E. 2d 319 (1946).

A defendant, however, in a capital case who fails to make even a general objection at trial when doing so could have saved the trial from error runs a high risk of waiving his right to complain on appeal where the incident complained of is not patently erroneous, or if erroneous, not patently prejudicial.

## III

[4] Between 7:00 a.m. and 8:00 a.m. on February 20 defendant was taken by a Swansboro Rescue ambulance to the Onslow Memorial Hospital for treatment of his bullet wound. Shortly after 8:00 a.m. Woodward questioned defendant at the hospital extensively about the incident then under investigation. Defendant unsuccessfully at trial challenged the admissibility of defendant's statement to Woodward made at this time. By his assignment of error number 8 defendant contends the trial judge committed error in admitting this statement on the ground that defendant was actually in custody and, therefore, entitled to be warned of his rights as required by *Miranda v. Arizona,* 384 U.S. 436 (1966). Woodward admitted that no such warnings were given before he questioned defendant at this time.

Upon objection to Woodward's relating defendant's statement, the trial judge properly excused the jury to conduct a *voir dire* inquiry. On *voir dire,* consisting entirely of the testimony of Woodward, the evidence was that Woodward had been instructed by his superior "to go to the hospital that a victim was coming in that had been shot and for me to interview him to see if I could find out what happened. So to me he was a victim, he was definitely not a suspect of the crime." Woodward further testified that at this time defendant was not in custody. Later that day after the investigating officers, including Woodward, had compared defendant's initial statement to

State v. Strickland

Woodward with Chappell's version of what happened, defendant did become a prime suspect and was taken into custody from the hospital by Woodward at 3:00 p.m. on February 20. While in custody he was fully advised of his rights, affirmatively waived them, and made other statements. Their admissibility is not challenged. Upon this evidence the trial judge found and concluded in part as follows:

"2. The defendant arrived at the hospital in the emergency vehicle, he was not in custody, and was not under any police surveillance at that time.

"3. That the defendant was not suspected as a party to the crime at the time Officer Woodward interviewed him in the emergency room at the hospital at which time he made a statement.

* * *

"The Court concludes that the first statement was a noncustody interrogation and that the defendant's rights were in no way violated."

After the trial judge's findings and conclusions were made, however, the *voir dire* was reopened to permit the district attorney to place in the record Woodward's testimony regarding the precise warnings which were given to defendant in the afternoon at the sheriff's office. On further cross-examination by defense counsel at this stage of the *voir dire* the following exchange occurred:

"MR. BRASWELL: Mr. Woodward, I assume that if he had told you he was going on home, you would have let him go home?

"A. No, sir.

"MR. BRASWELL: So he didn't have any right to go or not to go with you, it was go or be carried, is that right?

"A. I asked him first. If he had refused, then I would have took him in custody, yes, sir.

"MR. BRASWELL: He knew that, did he not?

"A. I don't know what he knew, I wish I could testify as to what he knows."

Defendant strenuously argues that this testimony demonstrates conclusively that defendant was in fact in custody when he made

his first statement to Woodward at the hospital. Counsel may have intended by his questions to refer to the morning at the hospital but it is patently clear from the record that Woodward in his replies was referring to that afternoon when, as he had earlier testified, "I came back to the hospital and arrived . . . at approximately three p.m. . . . and then we took him into custody. . . . I asked him to come and go with me to the Sheriff's office."

In any event the trial judge's findings that the defendant was not in custody at the hospital when first questioned by Woodward are clearly supported by some competent evidence, if not by all the evidence. The defendant not being in custody at that time, the *Miranda* warnings and accompanying waivers were not required as a prerequisite to the admissibility of defendant's statement. *State v. Sykes*, 285 N.C. 202, 203 S.E. 2d 849 (1974) ; *State v. Ratliff*, 281 N.C. 397, 189 S.E. 2d 179 (1972) ; *State v. Gladden*, 279 N.C. 566, 184 S.E. 2d 249 (1971).

## IV

By assignments of error numbers 1 through 7 defendant challenges various rulings by the trial judge during the trial which he contends improperly admitted into evidence certain illustrative exhibits, allowed leading questions and conclusory testimony, constituted expressions of opinion regarding the evidence in violation of General Statute 1-180, and unduly limited the defendant's right of cross-examination. We have carefully examined each of these assignments. They are all totally without merit and are overruled without discussion.

## V

Defendant's assignment of error number 12 is to the trial judge's failure to allow defendant's motion for new trial for errors committed and because the verdicts were contrary to the weight of the evidence. That aspect of this motion dealing with errors committed is purely formal. We have already dealt with the substance of it. The second aspect of this motion is addressed to the discretion of the trial judge. He acted well within that discretion in denying this motion. This assignment of error is overruled.

## VI

[5] Finally defendant complains that it was error for the trial judge to enter judgments of death in the murder cases. This

---

Griffin v. Wheeler-Leonard & Co.

---

Court has considered and a majority has consistently rejected all of defendant's arguments on this point and does so here. *State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222 (1976) and cases cited therein; *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). However inasmuch as the crime was committed on February 20, 1974, before the effective date of N. C. Sess. Laws 1973, c. 1201 § 1 amending General Statute 14-17, Chief Justice Sharp, and Justices Copeland and Exum dissent from that portion of this opinion affirming the imposition of the death sentences and vote to remand for the imposition of sentences of life imprisonment. See their dissenting opinions in *State v. Williams,* 286 N.C. 422, 434-441, 212 S.E. 2d 113, 121-125 (1975).

No error in the trial.

Death sentences sustained by majority vote.