STATE of Missouri, Respondent,

v.

Bennie WILLIAMS, Appellant.

No. 54493.

Supreme Court of Missouri,
Division No. 1.

Jan. 12, 1970.

John C. Danforth, Atty. Gen., Peter H. Ruger, Asst. Atty. Gen., Jefferson City, for respondent.

Thomas H. Moore, St. Louis, for appel.-lant.

HOUSER, Commissioner.

Bennie Williams, convicted of armed robbery first degree with a dangerous and deadly weapon and sentenced to imprisonment for a term of 10 years, has appealed, raising three points.

First, defendant maintains that the court erred in overruling defendant's motion to suppress the in-court identification of defendant by state's witnesses Bruce and Tyrone Haskin for the reason that these witnesses viewed the defendant under circumstances suggesting to them that defendant was the assailant, and the suggestion so tainted the identification as to deny his constitutionally protected right to due process of law, under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L. Ed.2d 1199; Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267, and People v. Cooper, 31 A.D.2d 814, 298 N.Y.S. 2d 14.

At approximately 7 o'clock p. m. on March 20, 1968 Bruce Haskin, proprietor, and his son Tyrone Haskin were at work in a liquor store in the City of St. Louis. It was dark outside but the store was well-lighted by artificial lighting. Haskin was near the cash register; Tyrone near a cigarette counter. Three men entered the store. One of them, later identified as John Donley, ordered a fifth of Haig & Haig, which Haskin put on the counter. Donley then ordered some cigarettes. Haskin reached back to get the cigarettes. When he turned around to deliver them there was a pistol in his face. Donley said "This is a holdup." Donley told the other two men who entered the store with him to go back behind the counter and told Haskin to open the cash register. Haskin, who had his hands "up," told Donley that the register was already open. One of the men (later identified as defendant Bennie Williams) came behind the counter, armed with a knife, with a 3 or 4-inch blade. Donley told Williams to get the money out of the cash register and to look in Haskin's pockets. Williams took the wallet (containing $230) out of Haskin's pocket, handed it across the counter to Donley, and handed Donley the money out of the cash register ($80). Donley told Williams to get some whiskey. Williams got some fifths of whiskey and handed the whiskey over the counter. All this time Donley was holding the gun on Haskin. The third man was holding a knife on Tyrone. The third man reached under a counter and got some cigarettes at Donley's suggestion. The men were in the store from 5 to 7 minutes. Haskin testified that defendant Williams reached into his pocket and took the wallet with his hand. At that time Williams was at Haskin's side, the two men about a foot or a foot and a half apart. Williams' head was a little below Haskin's shoulder. Williams' gaze or eyes were directed downward, according to Haskin. After the things were handed to Donley the latter said "Let's go." Donley backed to the door with the pistol in his hand. Williams and the third man left first, followed by Donley. Haskin had never seen the three before. He followed them into the street, saw them get into a Buick parked in the alley. It had a light top, green or bluish body and a dent in center of trunk. He followed them in his car, which had been parked near the alley. He kept within 20–60 feet of the Buick, blowing his horn to attract the attention of the police. The Buick stopped on Cass Avenue. Haskin stopped his car. Defendant Williams got out of the Buick and facing towards Haskins called "Hey, Bankhead." Then Williams approached Haskin's car and said he thought the driver was Bankhead. Haskin said, "You're not thinking." Williams said "What's wrong?" Haskin replied, "You just held me up". Williams got back in the Buick and the cars moved off. Haskin continued to trail them. They were "going pretty fast." He finally lost them as they were going through an alley. Haskin went back to his store and called the police. When the police arrived Haskin gave them the above description of the Buick, adding that it was a 1954 or 1955 model, and the following description of the men: Three negro males 22–25 years old; one about 5′9″ or 10″ tall, one 6 feet, with some orange-colored clothing on. He did not remember how the other one was dressed. The police

left. The liquor store was closed at 9 p. m. The descriptions and that of the car were broadcast. Donley and another, one Mobley, were arrested when a car matching the description was observed by the police. Donley and Mobley, when arrested, fit the descriptions the arresting officers heard on the radio. When defendant Williams was arrested and viewed he conformed to the description heard by the officers over the air. About 11 or 11:30 o'clock p. m. the police called and asked Haskin to come to the police station. He and his son Tyrone went to the station. When they walked in an officer asked Haskin if he could identify any of these people. He saw three men. They were seated. Haskin identified two of the three (Donley and Williams) as men who had held him up. He "recognized them right away." He was unable to identify the third. Haskin testified that on the night of the holdup defendant Williams had his hair "processed"— worn "kind of up high" and looking "real slick." At the trial he made an in-court identification of defendant Williams, and identified a sweater-jacket with a "little orange in there" that defendant Williams was wearing at the time of the holdup. He also identified a pair of black trousers then being worn by defendant Williams. Tyrone made an in-court identification of defendant Williams. He testified that during the course of the robbery he looked at all three men and "was making it a point to remember all of them." He said he looked at defendant Williams "about a minute altogether." He noticed that he "had a process * * * like having your hair all slicked down," which is a way of hair styling "practiced more by negroes." (Defendant Williams' hair at the date of trial was different; it was "natural styling.") He testified that the man with the gun (Donley) took his watch from him. At the police station Tyrone was shown a watch, which he identified as his watch. At the police station Tyrone identified two of the three men he viewed (defendant Williams and Donley) as having been in the holdup. He made this identification

"practically right off * * * practically when we came in." He could not identify the third participant. He had never seen any of the three men before the holdup. At the trial Tyrone identified the watch, a gold Baylor wrist watch, with a white face and a gold expansion band, as the watch taken from him by the man with the gun and previously shown to him at the police station. He described to the police one of the men as having khaki pants and khaki shirt. At the trial he was unable to identify the black trousers or a blue jersey-knit shirt shown to him.

■ Defendant did not have counsel at the time of his identification at the police station and now complains that he was entitled to have a lawyer present at that confrontation. There was testimony from the officers that a card was read to defendant, advising him that he had a right to remain silent; that anything he said could and would be used against him in court; that he had a right to a lawyer and to have him with him while being questioned; and that if he could not afford to hire a lawyer one would be appointed for him before any questioning if he desired. There was further testimony that defendant was advised that he had a right to a lawyer "at the show-up" and that it was not necessary for him to "enter into any type of show-up if he did not wish to." Defendant admitted the reading of the card explaining his Miranda rights, but denied the advice with respect to his right to counsel at the showup and his right not to be placed in a showup. This conflict in the evidence was for the trial judge to resolve and we find no abuse of discretion in his ruling.

■ Defendant complains that if he was properly advised there was no showing of a knowing and intelligent waiver of his right to have a lawyer present. Our review of the record indicates that defendant made a knowledgeable and intelligent waiver.

■ Defendant further contends that the identification procedure was manifestly un-

fair; that there was no lineup; that the identifying witnesses viewed the suspects at the same time rather than separately, and that the message was clear to the Haskins that the police suspected these three men. "The absence of a lineup is only one factor in the totality of circumstances." State v. Blevins, Mo.Sup., 421 S.W.2d 263, 267[2]. Separation of the identifying witnesses, when they are more than one in number, is not a constitutional requirement. On the totality of the circumstances, as hereinafter analyzed, no unfairness is shown by this record to have resulted from the identification procedure.

The language of Wade necessarily leads to the conclusion that a conviction based in part upon an in-court identification may be sustained where, as in this case, the determination can be made from the record that the in-court identification had an independent source and was not based upon the confrontation at the police station. Both Mr. Haskin and his son had ample opportunity to observe the three men at the time of the holdup at the store and to be able to describe their physical appearance, clothing and anything unusual about them independently of the police station confrontation. Donley and Williams were both in close communion with Haskin at the store, the one at the end of the gun across the counter, the other close enough to extract his wallet from his pocket. Haskin observed defendant's height, weight, hair-do, clothing, looked him in the eye and observed that he looked downward while he was taking the wallet. The store was well-lighted. The exercise took from 5 to 7 minutes. Tyrone "made it a point" to observe the men carefully. He was able to describe defendant with some particularity and accuracy. There was no hesitancy or delay in recognizing defendant Williams and Donley when the Haskins first saw them at the police station; they immediately identified them. There was no substantial discrepancy between the descriptions given to the police by the Haskins and defendant's actual description. There was no appreciable lapse of time between the holdup and the police station confrontation (4 or 4½ hours). There was no evidence that the police made any representations or suggestions to the Haskins when they were asked to come to the station, or after arriving and prior to viewing the suspects, which might have unduly influenced them. The police merely said that "they had caught three people that they · thought were involved in the holdup and wanted to see if I could identify them." The state, by clear and convincing evidence, established that the in-court identifications were based upon the Haskins' prior observations of the defendant, independent of the impressions made upon them at the police station confrontation, within teaching of Wade, 388 U.S. 218, l. c. 240, 241, 87 S.Ct. 1926, l. c. 1939, 1940, 18 L.Ed.2d 1149, l. c. 1164, 1165. This point is ruled against defendant. State v. Mentor, Mo.Sup., 433 S.W.2d 816; State v. Tehee, Mo.Sup., 445 S.W.2d 285; State v. DeLuca, Mo.Sup., 448 S.W.2d 869 (decided this date); State v. Franklin, Mo.Sup., 448 S.W.2d 583 (decided this date); Fitts v. United States, 5 Cir., 406 F.2d 518; Commonwealth v. Cooper, Mass.Sup. (1969), 248 N.E.2d 253.

Next, error is assigned in overruling defendant's objection to hearsay testimony by Bruce Haskin. The complaint is directed to his testimony that he had a conversation with defendant Williams' mother in which she said she would pay him back if he did not prosecute her son. There was no error in the ruling with respect to this evidence, which was given on redirect examination, because the defense opened the door to disclosure of the whole conversation between Haskin and defendant's mother when on cross-examination defendant's counsel asked Haskin whether he had occasion to talk with the mother, five or six weeks after the robbery, and whether on that occasion he told her that defendant Williams was not in the store at the time of the robbery. "Where a witness has been cross-examined as to a part of a conversa-

tion * * * the whole thereof, to the extent that it relates to the same subject matter and concerns the specific matter opened up, may be elicited on redirect examination." 98 C.J.S. Witnesses § 422; State v. Schenk, 238 Mo. 429, 142 S.W. 263, 270[6]; State v. Parker, Mo.Sup., 403 S.W.2d 623, 625–626[2].

Finally, exception is taken to the action of the court in overruling defendant's objection to the testimony of a patrolman that when he arrived at the liquor store Bruce Haskin stated that he had just been held up by three negro males and they had taken an amount of currency, liquor and a wrist watch; that they had made their escape in a 1955 or 1956 Buick, white over blue, last seen going east on Montgomery. The ground of the objection is that it was hearsay evidence. These facts had been testified to by Bruce and Tyrone Haskin. The patrolman's recital introduced no new fact into the case; did not relate to any facts not established by other competent testimony; was cumulative merely, and therefore not prejudicial. Bond v. Wabash Railroad Co., Mo.Sup., 363 S.W.2d 1, 4[2]. Furthermore, the testimony was admitted not to prove the truth of the facts therein asserted but to show the basis for the police report and how the data was obtained for the later broadcast over the police radio by the patrolman. "The hearsay rule has no application where the extrajudicial utterance or writing is offered ' "not as an assertion to evidence the matter asserted, but without reference to the truth of the matter asserted * * *." ' Wigmore on Evidence, § 1766, quoted in Mash v. Missouri Pac. R. Co., Mo.Sup., 341 S.W.2d 822, 827." Bond v. Wabash Railroad Co., supra, 363 S.W.2d 1. c. 5[4].

The judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and TITUS, Sp. J., concur.

STORCKMAN, J., not sitting.