STATE of Missouri, Respondent,

v.

Roy ROBERTS, Appellant.

No. 66933.

Supreme Court of Missouri,
En Banc.

May 7, 1986.

Rehearing Denied June 17, 1986.

Henry Robertson, St. Louis, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

A prison guard was murdered by inmates of the Missouri Training Center for Men at Moberly on July 3, 1983. For his part in the crime appellant was convicted of capital murder, § 565.001, RSMo 1978 (repealed effective 10-1-84) and sentenced to death,[1] § 565.008, RSMo 1978 (repealed 10–

---

**1.** The capital murder statute then in effect included among others the following aggravating

1–84), accordingly under Mo. Const. art. V, § 3 the appeal falls within the original appellate jurisdiction of this Court.

Appellant assigns as error: (1) failure to instruct on the proper mental state for accomplice liability; (2) insufficiency of the evidence to sustain a conviction of capital murder; (3) allowing improper rebuttal testimony in the punishment stage; (4) permitting "death-qualification" of the array; (5) disproportionality in the death sentence; and (6) plain error in the failure of the trial court *sua sponte* to control prosecutorial comment regarding: (a) the required mental state for accomplice liability; (b) appellant's supposed bad faith in failing to produce promised evidence; (c) telling the jury during the punishment phase the penalty assessed would not be binding on the trial judge.

From the substantial evidence supportive of the verdict the jury could reasonably have found the following: On July 3, 1983, at approximately 9:45 p.m., Mr. Thomas Jackson, a 62-year-old veteran correctional officer described by one inmate at trial as "one of the better officers" in his treatment of prisoners, entered B wing of Housing Unit 2 in an attempt to bring out an unruly inmate named Jimmy Jenkins.

Jenkins and appellant were among 459 prisoners assigned to Unit 2, an X-shaped building consisting of four cell wings (designated "A" through "D") branching from a central rotunda, where security was supervised from a circular desk called the control center. The rotunda was secured from the wings by reinforced glass partitions which allowed officers at the control center to observe the inmates. The only entrance to and from each cell wing was through a reinforced glass door.

On the fateful evening, Jackson was one of three "wing men" assigned to guard the cell wings of Housing Unit 2. Twenty-seven correctional employees were on duty that night (4:00 p.m.-to-midnight shift) to police Moberly's 1,643 inmates and by regulation the wing men operated unarmed. At such times, the inmates were allowed certain freedom as each had the key to his individual cell and could move freely within the wings.

Trouble began when appellant with several other inmates gathered in B wing and were drinking a concoction of homemade alcohol. The guards became aware of the problem as the men became obstreperous and at about 9:45 p.m. decided to separate Jimmy Jenkins, whose conduct had become increasingly offensive, and bring him out of the wing. To accomplish this officer Jackson entered the wing but Jenkins refused to comply with Jackson's orders so he returned to the control center for assistance. While deciding an appropriate course of action, the guards observed a crowd of about thirty inmates including appellant assembling at the far end of the wing. About this time inmate Robert Driscoll assembled a homemade knife from parts he had collected and hidden in his cell. Thirteen such knives or "shanks" were retrieved from the wing after the ensuing melee.

At approximately 10:00 p.m. the control desk officer called the prison captain for reinforcements and at the same time Jackson reentered the wing accompanied by two other guards. The three unarmed officers succeeded in physically securing Jenkins and began walking him from the wing toward the "safety" of the control center. Jenkins was flanked by two officers, with Jackson following eight to ten feet behind. It was then that appellant, who weighed about 300 pounds, challenged his fellow inmates with the words, "are we going to let them take Jimmy out?" Appellant and another then shouted "let's rush them" and about twenty to thirty including appellant rushed the guards.

The two guards with Jenkins made it into the control center area where four or five

circumstances as a basis for imposition of the death penalty: that the murder was committed against a corrections employee while in performance of his official duty *and* was commit-

ted by a person in a place of lawful confinement. Sections 565.012.2(8), (9), RSMo 1978 (repealed effective 10–1–84).

other officers awaited. Tragically however, Jackson was caught in the crush of inmates several feet short of the door. While a number of inmates charged into the rotunda, at least ten of the group remained outside the door surrounding Jackson. It appeared momentarily that Jackson might escape but he was stopped short of the control center door by appellant who seized him by the arm and hair, twisting his head "completely around" and pinning him against the door casing. With Jackson held in this position by appellant, inmate Driscoll stabbed him three times in the chest, two of which penetrated the heart. As three fellow guards tried frantically to pull Jackson to safety through the door, appellant released Jackson momentarily to strike one of the rescuing guards while several of those attempting the rescue were knifed and struck by other inmates. During this time Jackson was visible through the glass partition, his body jerking from the stab wounds and his shirt covered with blood. After appellant had released Jackson and struck the would-be rescuer, he resumed his grip on the stabbed and bleeding Jackson and inmate Rodney Carr then stabbed Jackson in the abdomen. Jackson was also stabbed near his left eye, possibly by Driscoll. It is apparent from the record that appellant's hold on the victim prevented him from escaping or defending himself, though other inmates at various times had their hands on the guard.

Jackson's body was finally pulled through the door by guards into the rotunda while the fight was still in progress. One guard testified that appellant "came out at us" into the control center after releasing Jackson and engaged in a fistfight. While the worst of the fight apparently lasted only a few minutes it took about one half hour to completely "corral" the inmates and herd them into the wing, and only after sixty to eighty shotgun blasts were fired into the floor and ceiling by newly arriving guards. Five guards and approximately thirty inmates required treatment for injuries.

At the time of the murder appellant was a 30-year-old white male with six prior felony convictions, including two of an assaultive nature (robberies) in 1979. Imprisoned in the Missouri State Penitentiary at Jefferson City in 1979 he was transferred to Moberly in March 1983. Appellant did not testify at the guilt phase of the trial but called nine witnesses, including eight inmates, to support his defense that he was not involved in the murder of officer Jackson. His only admitted role was engaging in a "fistfight" with guards in the control center towards the end of the melee.

The jury in assessing the death penalty found that appellant was "responsible for the murder of Tom Jackson while performing his duty as a correction officer," and that appellant was "in lawful custody of a place of confinement." Sections 565.012.-2(8), (9) RSMo 1978 (repealed effective 10–1–84).

■ We first address appellant's principal points implicating basic concepts of accomplice liability found in §§ 562.036, 562.-041, RSMo 1978. These code provisions impute to a defendant the criminal *conduct* of another, if the defendant himself has "the required culpable *mental state,*" § 562.036 (emphasis added), further defined in § 562.041.1(2) as having occurred when:

> Either before or during the commission of an offense *with the purpose of promoting the commission of an offense,* he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense. [Emphasis added.]

In an extensive discussion of this provision, the Court in *State v. White,* 622 S.W.2d 939 (Mo. banc 1981), *cert. denied,* 456 U.S. 963, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982), found the "purpose to promote" language an accurate description of the required mental state of an accomplice, and specifically approved a capital murder instruction employing such language. The Court refused to declare as a matter of law that an accomplice must be found to have both the intent to purposely promote the

commission of the murder *and* the intent for the underlying felony.

> If the Legislature had intended to require an aider to have a dual intent, it would have said so in the statutes. To the contrary, the only [intent] requirement expressed in the three sections is found in § 562.041.1(2) [described above].
>
> . . .
>
> Therefore to be found guilty of a particular offense, an aider must aid another or others with the conscious object of causing that offense. A finding that the aider had this intent is equivalent to finding that the aider and active participant shared a common intent or purpose.

*Id.* at 944–945; *see also State v. Betts,* 646 S.W.2d 94, 96–97 (Mo. banc 1983); *State v. Robinson,* 641 S.W.2d 423, 425–426 (Mo. banc 1982).

Although the court in *White* found no reversible error in the challenged description of the necessary mental state for an accomplice to capital murder,[2] the Court recognized the requisite intent for capital murder as that of "coolly and fully deliberating on the matter."[3] *Id.* at 944.

A subsequent revision in the verdict directing instruction for accomplice liability in capital murder cases strongly suggests incorporating both the "purpose of promoting" and "reflected ... coolly and fully" language, while citing *White* for the proposition that "[t]he failure to make this or a similar modification is not necessarily reversible error." MAI–CR2d 2.12 Note on Use 7 (effective January 1, 1983); *State v. Johns,* 679 S.W.2d 253, 259 (Mo. banc 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

It is against this background, with its concern for an individualized finding of deliberation on the part of an accomplice, that appellant principally challenges his conviction. Appellant claims there was insufficient evidence on this issue to sustain a conviction, that the jury was misinstructed on the law of accomplice liability and that he was prejudiced by the prosecutor's portrayal of this concept to the jury. We disagree.

Appellant argues that he happened to be holding the victim while he was stabbed independently and coincidentally by Driscoll and Carr.[4] The only "safe inference" from the evidence, according to appellant, is that he intended to engage in a fistfight with the guards,[5] which falls short of demonstrating an intent to promote the commission of capital murder.

Under the applicable standard of review, the evidence is taken in a light most favorable to the state, affording all reasonable inferences supportive of the verdict and disregarding contrary evidence and inferences. *State v. Franco,* 544 S.W.2d 533, 534 (Mo. banc 1976), *cert. denied,* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977). In this connection our inquiry centers on

---

**2.** The Court noted the jury was additionally instructed that the defendant's culpability should be determined on each degree of the offense individually and independently from other defendants. MAI–CR2d 2.14; Section 562.051, RSMo 1978. A converse instruction also informed the jury that a guilty verdict must be predicated on the accomplice/defendant's having reflected coolly and fully on the murder. *State v. White,* 622 S.W.2d 939, 945–46 (Mo. banc 1981), *cert. denied.* 456 U.S. 963, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

**3.** This central concept of deliberation stems from the following language of § 565.001, RSMo 1978 (repealed effective 10–1–84), pursuant to which appellant in *White* and in the case at bar were convicted: "Any person who unlawfully, *willfully, knowing, deliberately,* and with *premeditation* kills or causes the killing of an other human being is guilty of the offense of capital murder." (Emphasis added.) *See generally, State v. Newlon,* 627 S.W.2d 606, 614 (Mo. banc 1982), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *State v. Marston,* 479 S.W.2d 481, 484 (Mo.1972) (cases discuss meaning of italicized terms).

**4.** Robert Driscoll was convicted of capital murder and also received a death sentence. *State v. Driscoll,* 711 S.W.2d 512 (Mo. banc). Rodney Carr was convicted of capital murder and, because the jury was unable to agree on punishment, was sentenced to life imprisonment without possibility of parole for fifty years. *State v. Carr,* 708 S.W.2d 313 (Mo.App.1986).

**5.** Appellant's counsel in oral argument suggested that appellant might have only intended to take the victim as a hostage.

the evidence concerning the element of deliberation and the reasonable inferences permissible from the circumstances. *State v. Malady*, 669 S.W.2d 52, 55 (Mo.App. 1984). While the facts must be consistent with each other and with the hypothesis of defendant's guilt and inconsistent with his innocence and exclude every *reasonable* hypothesis of his innocence, the mere existence of other possible hypothesis is not enough to take the case from the jury. *Franco*, 544 S.W.2d at 534–35 (emphasis added). But it is also correct to say "[w]here two *equally valid* inferences can be drawn from the same evidence, the evidence does not establish guilt beyond a reasonable doubt." *State v. Black*, 611 S.W.2d 236, 240 (Mo.App.1980) (emphasis added).

■ Considering the circumstances including appellant's actions before, during and after the assault, *State v. Connor*, 651 S.W.2d 550, 555–56 (Mo.App.1983), a valid inference may be drawn establishing the required mental state. Further we find no equally valid inference supportive of appellant's contention that his actions at most show an intent to prevent the guard from escaping from the inmates into the rotunda, with no knowledge of, or consent to the stabbings by inmates Driscoll and Carr demonstrating deliberation or intent on his part with regard to Jackson's death. Simply put, the evidence does not provide an "equally valid inference" that the killing of Jackson was merely the tragic but incidental result of a brawl between guards and prisoners in which appellant's actions bespeak only an intent to brawl, not to purposely aid others or participate in committing the murder.

Following the first unsuccessful attempt to remove Jenkins from the wing and Jackson's departure to secure help from other guards, Driscoll was observed by a fellow inmate assembling a homemade knife in his cell, placing the knife in a clear plastic bag and walking into the hallway where appellant and the others were assembled. It is safe to infer that Driscoll was not the only armed inmate at that point, since thirteen "shanks" were recovered from the floors of the cell wing and control area following the riot.

Even if we were to assume that appellant in the beginning was unaware of the knives possessed by his fellow inmates and unaware that his incitement to rush the guards might have deadly consequences, these facts became readily apparent when he pinned Jackson against the partition wall. Jackson was stabbed at least three times in the chest, into his heart and lungs, while appellant first held the guard. Captain Denver Halley, trying to pull Jackson from appellant's grip into safety, observed the guard "jerking and blood getting all over him." Jackson's blood-soaked shirt was immediately obvious to Halley and, it is certainly a valid inference that this was equally obvious to appellant, whose grip on Jackson's hair and arm made the guard a stationary target against the door casing.

If it is assumed that it was at this point appellant first became aware of the deadly effect of his participation in these actions and harbored no intent to promote the commission of murder and on such realization released the guard, such assumption disappears in the light of what followed. While holding the victim appellant used his free hands to fight off the rescue efforts of Captain Halley, striking him in the jaw. Appellant immediately resumed his grip on Jackson, this time around the neck, while inmate Carr stabbed him in the abdomen. Releasing Jackson's apparently dead body, appellant continued his role in the affair by entering the control area and striking a guard in the head before finally retreating with other inmates in the face of blasts from the riot guns.

■ Appellant's continuing and intimate role in this chain of events was confirmed by eye-witnesses, including the salient facts of his restraining holds on the victim at two separate times and that this made possible the fatal stabbings. In sum

his actions reflected a purpose to promote with deliberation and premeditation necessary to sustain the murder conviction.[6] The element of premeditation is defined as thought beforehand for any length of time however short. *State v. Turner,* 623 S.W.2d 4, 7 (Mo. banc 1981), *cert. denied,* 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); *State v. Newlon,* 627 S.W.2d 606, 614 (Mo. banc 1982), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). From the "repetition of the blows [and] the viciousness of the attack, the [jury] could infer premeditation and deliberation even though 'at the moment.'" *State v. Hatfield,* 465 S.W.2d 468, 471 (Mo.1971) (quoting *State v. Foster,* 61 Mo. 549, 553 (1876)).

■ Appellant next asserts as reversible error a failure to instruct on the proper mental state of accomplice liability in capital murder.[7] To the contrary we hold the verdict director provided an adequate submission of the required findings under the law, understandable to an average juror.

---

**6.** Appellant's direct and continuous physical role in the murder make it unnecessary for us to explore the precise limits placed by our criminal code provisions on the common law rule that an accomplice could be held accountable if the principal's offense was a natural and probable consequence of a mutually intended offense. *See generally State v. Logan,* 645 S.W.2d 60, 64–65 (Mo.App.1982). Suffice it to say that appellant's physical acts of participation went far beyond the mere verbal encouragement that might have supported conviction in a pre-code setting. *Compare State v. Stidham,* 305 S.W.2d 7, 15 (Mo.1957) (mere encouragement enough in the absence of statutory provisions, for murder conviction of inmate with others in the killing of another inmate during a prison riot). *See also* Comment, Accomplice Liability Under the 1979 Missouri Criminal Code, 44, Mo.L.Rev. 233, 240 (1979).

**7.** The state's verdict director, a version of MAI–CR2d 15.02 as modified by MAI–CR 2.12 Note on Use 7, was as follows:

A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

If you find and believe from the evidence beyond a reasonable doubt:

*State v. Marston,* 479 S.W.2d 481, 485 (Mo. 1972).

As previously noted, under the general rule if an accomplice has a purpose to promote an offense, he may be found to have the required culpable state of mind for that offense. *State v. Johns.* There the Court found the following paragraph of a modified capital murder instruction an accurate submission of the elements necessary for a conviction on a theory of accomplice liability: "that *with the purpose of promoting or furthering the commission of capital murder,* the defendant acted together with or aided or encouraged Robert Wishon in committing that offense." 679 S.W.2d at 259 (emphasis added); *see supra* note 7, fifth paragraph. Relying on *State v. White,* the Court found the instruction an accurate version of MAI–CR2d 2.12 (Defendant Responsible for Conduct of Another Person—State's Verdict Directing Instruction), and the fact that it differed from a suggested modification in Note on Use 7 for capital murder cases was of "no

---

First, that on July 3, 1983, in the County of Randolph, State of Missouri, certain persons believed to be Robert Driscoll or Rodney Carr caused the death of Tom Jackson by stabbing him, and

Second, that certain persons believed to be Rodney Carr or Robert Driscoll intended to take the life of Tom Jackson, and

Third, that certain persons believed to be Rodney Carr or Robert Driscoll considered taking the life of Tom Jackson and reflected upon this matter coolly and fully before doing so, then you are instructed that the offense of Capital Murder has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the death of Tom Jackson, the defendant acted together with or aided such other persons believed to be Rodney Carr or Robert Driscoll in causing the death of Tom Jackson and reflected upon this matter coolly and fully.

then you will find the defendant guilty of Capital Murder.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the propositions submitted in this instruction, you must find the defendant not guilty of that offense.

consequence." *Johns*, 679 S.W.2d at 259–60.

The suggested revision in Note on Use 7 impliedly recognizes that the mental state required by § 562.041.1(2), as construed in *White*, is a statutory minimum for accomplice liability crimes. Because deliberation is a concept important and unique to capital murder, the suggested revision adds to the "purpose to promote" language, the requirement that the defendant "reflected upon this matter coolly and fully." By requiring the jury to ascribe a more specific mental state to a capital murder accomplice than that required by *White*, the suggested, optional language of the revision places a higher burden on the state than that mandated by § 562.041.1(2). The instruction here includes verbatim the language found in the suggested revision and is proper under the law, nevertheless appellant contends the instruction erroneously lessens the required finding of intent. His argument is twofold: first, that "the purpose of promoting or furthering *the death* of ..." language is equivalent to the mental state for second-degree murder and that the instruction should have specifically required a "purpose to promote or further the commission of *capital murder*" (emphasis added) as was the case in *Johns;* second, that the instruction is not saved by the "reflected ... coolly and fully" language because, as structured grammatically, it reflects only an intent *to aid*—not an intent that death result.

It should first be stated that it is difficult to discern a prejudicial difference in requiring lay jurors to find a purpose to promote "death" as opposed to the legal label of "capital murder." To the extent, however, that the term "death" might permit the jury to exclude from its consideration the deliberation element necessary for capital murder, that element is explicitly included in the "coolly and fully reflected" language. The instruction required specifically that appellant have "aided" Carr and Driscoll in "causing the death of Tom Jackson *and* reflected upon *this matter* coolly and fully ..." (emphasis added). If we accept the assertion that the deliberation element arguably refers to aiding, it certainly refers to causing death as well and thus required a finding of both intents, beyond that mandated by statute. *White*, 622 S.W.2d at 944. Appellant was not prejudiced; indeed under the instruction the state assumed an added burden.[8]

■ Finally appellant argues even if we find evidence sufficient for a conviction and accept as adequate the instruction submitting the issue of capital murder, the prosecutor's misstatements of law during voir dire and closing argument prejudiced appellant by effectively holding him "strictly liable" for the acts of other inmates. Because the alleged errors in voir dire were not raised in the motion for new trial and because the prosecutor's closing argument was virtually void of contemporaneous objection, we examine these allegations for plain error. Rule 29.12(b). On review of the complete record, including the highlighted excerpts suggested by appellant, we find no reversible error and necessarily no "manifest injustice" under the plain error standard.

■ First, appellant both exaggerates the prosecutor's "education" of the jury on voir dire and underestimates defense counsel's success in limiting such inquiry, which filled four of the 172 transcript pages of voir dire. During this examination of the array the prosecutor ostensibly sought to determine through various hypotheticals

---

**8.** The possibility of employing a converse instruction on the issue of deliberation was readily available to appellant. One of the express purposes of the revision suggested in MAI–CR2d 2.12 Note on Use 7 is to allow for a converse on this point. In addition, while appellant successfully tendered MAI–CR2d 3.66 (presence at scene of a crime not enough for criminal responsibility), there is no indication that he offered MAI–CR2d 2.14, explaining that a person is only criminally responsible for the offense compatible with his own state of mind. Section 562.051, RSMo 1978.

whether prospective jurors could follow the law on accomplice liability for capital murder. Appellant contends the prosecutor was allowed to commit the veniremen to a theory of the case based on felony murder. While it is generally true that counsel may not extract a commitment from a panel to a particular course of action, *State v. Reed*, 629 S.W.2d 424 (Mo.App.1981), the record shows that in every instance where this arguably might have been the implication the trial judge either sustained an objection by defense counsel or guided the prosecutor back to a general discussion of legal theory by stating that the jury instructions would ultimately govern.[9]

9. When the example excerpted by appellant is placed in context, it reveals that voir dire was ultimately confined to general theory:

Q. Let's assume, I will preface by saying the fact situation which I am going to tell you is an example and has nothing to do with this case. Let's assume two individuals go into a—say a 7–11 store and let's assume both of the individuals are armed, and when these two individuals go into the 7–11 store, let's assume that one of the actors or defendants points the gun at the clerk behind the cash register and that the other defendant who went in the 7–11 store with the first man held the patrons, the customers of the 7–11 store, at bay so they couldn't help the man behind the cash register and let's assume that the individual who has the gun on the man at the cash register says, "Your money or your life," and the man behind the cash register gives the money to the robber in front of him. Now, we know defendant No. 2 in our example is holding the patrons at bay preventing them from assisting the man who was being robbed behind the cash register. Let's assume for purposes of our example that the man who is holding the man behind the cash register at bay shoots him in the heart and kills him. They run out of the 7–11 store, get in the car and drive away. Now, assume that the man who was holding the patrons at bay is being charged with acting in concert with the killer. Does everyone understand that when you act in concert with another person that you are responsible for the conduct of the other person? In the example, does everyone understand that the man who encourages or aided or assisted the killer is just as legally responsible as the man who pulled the trigger?

MR. MARSHALL: I object, your honor.

THE COURT: Overruled.

MR. MARSHALL: May I be heard on the objection.

THE COURT: Yes.

MR. MARSHALL: First, that the Prosecutor is talking of a situation in which in the example brought the charge would not be capital murder. It would be murder in the first degree, murder committed during the perpetration of a felony which is not what my client is charged with and, in the second place, the Prosecutor is stating the law to the jury in his way, invading the province of the Court to instruct the jury.

THE COURT: Sustained.

MR. FINNICAL: Which one was sustained?

THE COURT: The last part.

MR. FINNICAL: Okay.

Q. Is there anyone here who because of their own personal background feels they could not hold a cohort in a crime guilty just as though he perpetrated the act? Is there anybody that couldn't do that? Mr. Lewellen?

VENIREMAN LEWELLEN: Are you saying if I go in the 7–11 with a buddy and I stated beforehand, "No shooting whatever", I am held—you are going to charge me with murder?

Q. Yes.

VENIREMAN LEWELLEN: No way.

Q. You are saying you could not? If two people commit a crime and you aid or encourage in any way the person who makes it able for him to kill that person, do you understand under the law you are just as guilty?

VENIREMAN LEWELLEN: No.

MR. MARSHALL: Again, object. The Prosecutor is stating the proposition as if it's a matter of law. It is for the Court to instruct upon the questions aren't couched in that manner.

THE COURT: Overruled.

VENIREWOMAN MILLER: I think what we all want to know is what the law is. It's a law that someone who is assisting or helping in something like that, a situation like that, whether they actually do the killing or not, is that the law?

Q. All right—

MR. MARSHALL: Object to the Prosecutor answering the question. That is a matter for the Court to rule on.

THE COURT: It will be in the instructions.

Q. The Judge will read the instructions at the end of the case. My question to you is, is there anything in your background or your experience that would prevent you from following the law or the instructions of the Court with respect to the fact that if somebody aids or encourages a person to murder somebody else, they are just as responsible as if they did it themselves?

MR. MARSHALL: Object, your Honor. The Prosecutor is trying to commit the prospective jurors ahead of time to the theory of the case.

THE COURT: Overruled.

Q. Mrs. Miller?

The underlying purpose of voir dire is to determine the ability and willingness of veniremen to follow the law and evidence, and counsel is to be given wide latitude in exposing any latent bias. *State v. Brown,* 547 S.W.2d 797, 799 (Mo. banc 1977). Appropriate here is the statement found in *State v. Green,* 511 S.W.2d 867, 873 [4, 5] (Mo.1974): "In short, control of voir dire examination is in the discretion of the trial court, and these circumstances do not show abuse of that discretion." *See also State v. Thompson,* 610 S.W.2d 629, 636–37 (Mo. 1981).

■ Appellant makes a similar claim with respect to the prosecutor's closing argument, alleging there were repeated and prejudicial misstatements of law. However, appellant's claim either takes statements from context or ignores preceding remarks by defense counsel which may have prompted them. As stated above, defense counsel made no objection to the allegedly erroneous statements and we find no "manifest injustice" in the court's failure *sua sponte* to declare a mistrial.

Appellant cites the following as an example of what he asserts as prejudicially erroneous prosecutorial argument:

> [The verdict director] *doesn't say he has to intend to kill him.* It says "with the purpose of promoting or furthering the death". In other words, *did he commit an act purposefully which furthered the death of Tom Jackson?* It doesn't require that he has to say, "Hey, Robert, we are going to kill Tom Jackson." That is not what it is. That is exactly what this specific type of law is aimed at. [Emphasis added.]

This argument is essentially a somewhat circuitous statement that the necessary intent to promote the commission of the act may be shown be deliberation "at the moment." Defense counsel followed with his own arguably misleading statements of law to the effect that appellant had no knowledge prior to seizing the victim that he would be stabbed, which in effect suggests early knowledge was required for conviction and that appellant was not guilty.

In sum, we fail to find reversible error where the opposing attorneys have vigorously argued their respective theories of the case without substantive objection and lawful instructions were ultimately submitted, fully supported by the evidence. Not only are trial courts vested with wide latitude in controlling argument of counsel, but we have previously found in more severe circumstances that "relief should be rarely granted on assertions of *plain error* as to closing argument, for where no objection was lodged, trial strategy is an important consideration and such assertions are generally denied without explication." *State v. Newlon,* 627 S.W.2d 606, 616 (Mo. banc 1982) (emphasis added).

■ Finally, appellant challenges as plain error the trial court's failure *sua sponte* to prevent the prosecutor in closing argument from repeated allegations of bad faith by defense counsel in failing to produce evidence promised in opening statement. Though defense counsel at no time objected to these statements, appellant claims the comments on defense counsel's lack of integrity were effectively argued as proof of guilt and their cumulative effect warrants a new trial. The challenged comments occurred in the following setting: During voir dire, several jurors questioned their ability to be fair if it was revealed appellant had had a prior murder conviction. Defense counsel at one point told a venireman to "assume" that was not the case and in his opening statement, defense counsel made the following comment: "The

VENIREWOMAN MILLER: I could follow the law.

Q. Is there any body else that could not follow the Court's charge and not find—or fail to find somebody guilty if they believed he is guilty beyond a reasonable doubt that he aided or encouraged somebody else to murder someone? Is there anyone here who could not do that? I take it from your silence each and everyone of you could.

evidence will show that Roy Roberts was not in prison for murder. He has never been convicted of murdering or killing anyone and he stands here, as the Judge told you, innocent." An objection to this statement was lodged by the prosecutor "unless he intends to offer that in evidence." Defense counsel made no reply and the objection was sustained. During the guilt phase appellant did not testify nor was proof of his prior convictions offered.

The prosecutor responded in closing argument with statements to the effect that defendant counsel had "led you to believe he was going to be honest and tell you everything about Roy Roberts" and "[w]hat is he hiding?" With respect to evidence offered at trial on appellant's specific whereabouts during the killing and an alleged failure to show appellant's absence from the immediate vicinity of the killing, the prosecutor made other comments about defense counsel's "not being really intellectually honest with you" and "chang[ing] his defense" because "he realized his client was guilty of capital murder." No objections were raised to these statements and the jury was accurately informed of appellant's prior convictions in the punishment phase of the trial.

The referenced remarks are based on legitimate inferences from evidence offered, or, in the instance of evidence not offered, to aspects of the trial proceedings with a basis in fact. Thus, the cases relied on by appellant are inapposite. *See State v. Mosier,* 102 S.W.2d 620 (Mo.1937) (prosecutor accused defense counsel of representing "kidnappers" and "criminals time and time again"); *Critcher v. Rudy Fick, Inc.,* 315 S.W.2d 421 (Mo.1958) (counsel accused of presenting a "framed-up" and perjured testimony).

The prosecutor's remarks in the case *sub judice* did not impugn defense counsel's integrity in the manner of the cited cases, nor were the remarks combined with a supportive trial court ruling which "clearly conveyed the idea that defendant's counsel had acted improperly at trial." *State v. Spencer,* 307 S.W.2d 440, 447 (Mo.1957). We find appropriate here, the following observations in *State v. Murphy,* 592 S.W.2d 727, 733 (Mo. banc 1980): "That defendant's *credibility* in the eyes of the jury may have been impugned on the basis of the prosecutor's remarks, made partly in response to a challenge by defense counsel and based upon evidence in this record, does not raise to the level of plain error to warrant reversal" under Rule 29.12(b). (Emphasis added); *see also State v. Stuckey,* 680 S.W.2d 931, 937 [7–10] (Mo. banc 1984).

Turning to allegations of error in the punishment phase of the trial, appellant first contends the trial court erred in overruling his objection to the testimony of a state rebuttal witness. The witness, Michael Dunn, was a Moberly inmate from an adjoining cell wing who testified that while standing in the corridor by the rotunda and looking into B wing he saw appellant holding Thomas Jackson at the time the guard was repeatedly stabbed by inmate Driscoll. Appellant argues that the prosecutor himself initiated through cross-examination testimony about the facts surrounding the stabbing as a means for introducing Dunn's irrelevant, prejudicial rebuttal testimony.

█ The record discloses that during cross-examination of appellant, he denied any role in the killing after that fact had been avoided on direct examination. The prosecutor asked appellant whether he told a prison priest that he had never held the victim. Appellant requested permission to fully answer and did so in a rambling narrative implying that his conviction was a result of lack of resources and investigation rather than guilt. Conspicuous in the cross-examination was the absence of any objection by defense counsel and yet appellant claims a later objection to the rebuttal witness reached back and in effect preserved his complaint regarding scope of cross-examination. Were we to consider

this matter preserved, *see State v. Slaten,* 252 S.W.2d 330, 333–34 (Mo.1952), rebuttal evidence is generally proper to "explain, counteract, dispel or disprove a *defendant's evidence* either directly or by implication," *State v. Cameron,* 604 S.W.2d 653, 658 (Mo.App.1980) (emphasis added), and it is proper when a collateral issue is volunteered during cross-examination, *State v. Cheesebrew,* 575 S.W.2d 218 (Mo.App.1978), or becomes part of a sweeping denial not in direct reply to a question posed by the prosecutor, *State v. Panter,* 536 S.W.2d 481 (Mo.App.1976), and so it is difficult to say that error occurred here. Hence even if we were to find the cross-examination of appellant improper so as to place the state's rebuttal testimony beyond the situations discussed above, the error would nevertheless be deemed harmless. The jury merely heard a brief recital of testimony similar to that copiously supplied through the guilt stage of trial. There was no prejudicial error warranting reversal. *State v. Williams,* 448 S.W.2d 865 (Mo. 1970).

■ Next, appellant attacks the exclusion of potential jurors based on their opposition to the death penalty. Specifically, appellant alleges error in the trial court's refusal to grant his motion to preclude "death qualification" questions during voir dire or, in the alternative, to provide separate juries at the guilt and sentencing phases. Appellant claims such refusal deprived him of a fair and impartial jury representing a cross-section of the community in violation of U.S. Const. amends. VI and XIV.[10]

The most recent discussion on this issue recounting our repeated rejection of similar constitutional challenges to "death qualification" of juries is found in *State v. Zeitvogel,* 707 S.W.2d 365 (Mo. banc 1986). As in *Zeitvogel,* we "decline defendant's invitation to overrule the prior decisions on point." At 367 (*see, e.g.,* cases cited); *see also Lockhart v. McCree,* — U.S. —, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

Finally appellant asserts as plain error, the prosecutor telling the jurors during voir dire and closing argument in the punishment phase that a verdict assessing punishment of death would serve only as a recommendation to the trial court.[11] Underlying this discussion is the controlling Supreme Court Rule 29.05 in vogue both on the date of the crime and the time of trial. The rule provides that:

> The court shall have power to reduce the punishment within the statutory limits prescribed for the offense if it finds the punishment is excessive. (Adopted June 13, 1979, effective Jan. 1, 1980.)

Previously a procedural rule had been adopted by statute, § 565.006.2 RSMo 1978

---

**10.** Appellant states that seventy-three veniremen were examined on their attitude toward capital punishment. Nineteen, or twenty-six percent were successfully challenged for cause.

**11.** In voir dire, the prosecutor described the jury's role in sentencing as follows:
> If an individual is found guilty of capital murder in Missouri the jury has two choices of punishment to recommend. One of the possible punishments is life in prison without probation and parole for 50 years and the other recommendation is a recommendation of death. Now, I didn't say sentence of death but recommendation of death. This is not like the old times where the jurors used to sentence people to death. Under the Missouri rules the jury makes the recommendation to the Judge to sentence—to consider sentencing the Defendant to death. Now, if the jury recommends life in prison without probation and parole, the Judge can only sentence the Defendant to that recommendation. The Judge can't consider imposing sentence of death or even consider it unless the jury recommends that he consider it but even if the jury returns a recommendation that the Judge consider imposing sentence of death, it's not mandatory on the Judge at sentencing. The Judge is like a 13th juror and has veto power. He can make the final determination as to whether or not the Defendant should get life in prison without probation or parole or death but if the jury doesn't return a recommendation that the Judge consider it, the Judge couldn't consider that. Does the jury understand that the jury doesn't sentence the Defendant to death?

(repealed effective 10–1–84), which provided that for homicide cases "[t]he judge shall impose the sentence fixed by the jury or judge." Thus under constitutional authority the Court established a rule relating to procedure which had "the force and effect of law," Mo. Const. art. V, § 5, superceding the statutory rule, *State ex rel. Peabody Coal Co. v. Powell,* 574 S.W.2d 423 (Mo. banc 1978), to the extent the statute might have been construed as contrary to the later Rule of Court.[12] It is apparent then that under the Rule the prosecutor's statement that the trial court could reduce punishment (within the statutory limits prescribed for the offense) was a correct statement of the law. This authority to reduce the sentence is designed as a safeguard in the system for those standing accused of crimes. Additionally, comments to the jury by defense counsel as well as by the court indicated agreement or acquiescence in the prosecutor's interpretation. Now, appellant complains that the comments diminished the jury's sense of responsibility to an extent violative of his eighth amendment rights, warranting reversal and cites *Caldwell v. Mississippi,* —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

*Caldwell* was a divided opinion striking down a Mississippi death sentence because of the prosecutor's invocation to the jury of automatic state supreme court review of death penalties. Three justices dissented and one took no part in the decision but significant was Justice O'Connor's pivotal concurrence stressing that argument of this type was not necessarily error of constitutional proportions, providing that the information in the prosecutor's comment was accurate and nonmisleading. *Id.* at 2646. The prosecutorial statement in *Caldwell* was inaccurate to an extent impermis-

sibly diminishing the jury's sense of responsibility because the scope of "automatic review" referred to was actually severely restricted by Mississippi law.

Here, because the prosecutor's statement that the court could reduce the punishment was a correct statement of law, the issue becomes, whether it was material or proper for the prosecutor to argue that fact? There is a significant difference between argument referring to the relatively remote possibility of parole, *see State v. Lewis,* 443 S.W.2d 186 (Mo.1969), or appellate review applying a "presumption of correctness," *see Caldwell,* 105 S.Ct. at 2647 (O'Connor, J., concurring), as opposed to the situation here in which the trial court had a firsthand opportunity to evaluate the evidence and determine whether a sentence of life imprisonment was warranted, the jury verdict on punishment notwithstanding. Thus though the prosecutor made a technically correct statement of law, the possibility exists that it may be used in such a manner to alter a jury's sense of responsibility, and accordingly, prosecutors should hereafter avoid such argument.

■ However, in this case it is not demonstrated that the error in argument, if any, to which there was no objection and to which defense counsel acceded, was manifest injustice calling for the court to have *sua sponte* declared a mistrial or to have admonished the jury. In the last instruction prior to deliberation on punishment the jury was told to "bear in mind ... that under the law it is your primary duty and responsibility to fix the punishment." MAI–CR2d 15.48. We find no error, plain or otherwise warranting reversal.

■ This Court is mandated to review all impositions of the death sentence. Sec-

---

**12.** We find no cases in which the cited portion of § 565.006, RSMo 1978, had been construed by the courts. However, by the time of trial the mandatory language of § 565.006.2 had been superceded by § 565.030.4, RSMo Cum.Supp. 1984, relating to the role of judge and jury in first degree murder cases. There have been no cases construing the new statute but we can say

that on its face the mandatory language of old § 565.030.4 that seemed to stand in conflict with Rule 29.05 has been eliminated. A fair construction of the new statute would be that there is no flat prohibition against reduction of punishment by the court in first degree murder cases.

tion 565.014, RSMo 1978 (repealed effective October 1, 1984; current § 565.035 RSMo Cum.Supp.1984). Appellant does not contend and we do not find the sentence of death was imposed under the influence of "passion, prejudice, or any other arbitrary factor." Section 565.014.3(1). The evidence clearly supports, pursuant to §§ 565.014.3(2), 565.012, the jury's finding of two aggravating circumstances. *See* note 1, supra.

Therefore the focus of our independent review is "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Section 565.014.3(3). We have previously conducted proportionality review of capital murder convictions arising in a prison setting. *See, e.g., State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982); *State v. Shaw,* 636 S.W.2d 667 (Mo. banc 1982), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1983); *State v. Trimble,* 638 S.W.2d 726 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983); *State v. Guinan,* 665 S.W.2d 325 (Mo. banc 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. Zeitvogel,* 707 S.W.2d 365 (Mo. banc 1986). We have also affirmed death sentences of accomplices in capital murder, *see, e.g., State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982); *State v. Gilmore,* 681 S.W.2d 934 (Mo. banc 1984); *State v. Johns,* 679 S.W.2d 253 (Mo. banc 1984), and the only aspect of the case at bar which could arguably be designated unique is that appellant was an accomplice *and* involved in a prison killing.

Unlike capital murder accomplices sentenced to life in prison, appellant here did more than provide transportation and a weapon, *see State v. White,* 622 S.W.2d 939 (Mo. banc 1981); nor was he a "weakling and follower in executing the murder scheme perpetrated" by another. *See State v. McIllvoy,* 629 S.W.2d 333, 341 (Mo. banc 1982). To the contrary, appellant here verbally directed the attack, *see Gilmore,* 681 S.W.2d at 939 (defendant or-

dered another to "take care of" the victim), and then twice immobilized the guard while others stabbed him. *See Newlon,* 627 S.W.2d at 610 (victim shot twice with a single shot shotgun).

Appellant's culpability, separate and apart from his accomplices, reached a level of intent sufficient to sustain his conviction for capital murder. *See Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982). He was thirty years of age with six prior felonies, including two robberies, at the time of the murder and though imprisoned for past crimes was undeterred from escalating his criminal activities to include the murder of a prison guard. As a result, "the jury could rightly conclude that no measure short of the death penalty was appropriate in this case." *Guinan,* 665 S.W.2d at 332. Finally, this Court has not hesitated to affirm death penalties imposed on inmates in the killing of other inmates to signal that there *is* a "real cost for prisoners who kill while in confinement." *Bolder,* 635 S.W.2d at 690; *see also Guinan, Trimble.* There can be no less of a cost for taking the life of an unarmed prison guard, whose ultimate protection is the deterrent of meaningful punishment. In affirming a death sentence in a prior capital murder case involving murder of a prison guard, this Court found no "sound reason or social policy for excusing the senseless killing of either fellow prisoners or corrections officers." *Shaw,* 636 S.W.2d at 677.

The death penalty imposed in this case is neither excessive nor disproportionate to the punishment imposed in similar cases.

The judgment is affirmed.

HIGGINS, C.J., BILLINGS, DONNELLY and WELLIVER, JJ., and CLARK, Special Judge, concur.

BLACKMAR, J., concurs in result in separate opinion filed.

ROBERTSON, J., not sitting.

BLACKMAR, Judge, concurring in result.

The prosecutor engaged in highly improper questioning on voir dire, and sim-

ilarly improper closing argument, in violation of the teachings of *Caldwell v. Mississippi,* —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The principal opinion minimizes the degree of misconduct, even to the point of appearing to condone it.

The prosecutor began on voir dire, asking questions such as the following:

Q. Does everyone understand· one possible punishment is life without probation or parole for 50 years? Another is *recommending the Judge to consider sentence of death.* Do all understand? I believe Sheridan indicated she holds no feelings one way or the other, if given a proper case she could consider *recommending the sentence to the Judge of death;* is that right?

Q. Mr. Tharp, I am going to ask you the magic question. Do you have any ethical moral or religious scruples against the death penalty such that you could not under *any case consider recommending to the Judge that he* consider imposing sentence of death? (Emphasis supplied).

Questions speaking in terms of "recommend" or "recommendation" are asked at least 90 times. The questions apparently are so understood by jurors, as the following excerpt shows:

*I think I feel certain—that I wouldn't want even though, even you are saying it would be a recommendation from me* I just feel like I would be too much of a party of taking someone's life. (Emphasis supplied).

Then, on closing argument, the prosecutor continued in the same vein.

*All I want you·to do is give Judge McKenzie the right to find out the background of this guy so, in fact, if it is justified he can do it.* Now, you know a little bit about Roy Roberts, just a little bit, and I am asking you—I asked Father Wheeler. I said do you have any argument with the system that *allows jurors to recommend to the Judge that he can*

*consider it after full and fair consideration of the background of this Defendant and what he has done in his lifetime.* I am not asking you to put Roy Roberts to death. *I am just asking you to give the Judge the opportunity* to study it and make a conscious well thought out decision about what is fair and just. (Emphasis supplied).

Argument of this kind has consistently been condemned. In *State v. Lewis,* 443 S.W.2d 186 (Mo.1969), this Court found plain error in the prosecutor's arguing that the jury's sentence would not be of great significance because of the availability of parole. We found that this argument minimized the importance of the jury's task and the depth of its responsibility.

Other courts have announced similar holdings in capital cases. *Fleming v. State,* 240 Ga. 142, 240 S.E.2d 37 (1977); *State v. White,* 286 N.C. 395, 211 S.E.2d 445 (1975). Some have directed reversal even in the absence of objection. *State v. Jones,* 296 N.C. 495, 251 S.E.2d 425 (1979); *State v. Gilbert,* 273 S.C. 690, 258 S.E.2d 890 (1979).

In *Caldwell,* 105 S.Ct. at 2639, the Court said:

On reaching the merits, we conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness ·of the defendant's death rests elsewhere.

Justice O'Connor concurred in this part of the opinion. She questioned only Part 4–A of Justice Marshall's opinion for the Court, expressing the thought that a state might properly instruct a capital jury as to the authority of the trial judge, the appellate courts, and the executive authority on a sentence of death.

This prosecutor was not trying to impart accurate information. The statement that the jury's function is that of "recommending to the judge to consider sentence of

death" is highly misleading as a description of present Missouri practice. Under the climate presently prevailing a circuit judge would risk his career if he were to set aside a death verdict rendered by a jury. This particular trial judge stated, immediately following the return of the verdict, that he intended to pronounce the sentence in accordance with the verdict. The closing argument also intimated that the sentencing judge would have recourse to information which had not been presented to the jury. The prosecutor was not trying to instruct the jury; he was trying to divert the jurors. He was suggesting, contrary to the scheme of our death penalty statutes, that the jury's role was not primary in determining whether the ultimate sanction was to be exacted.

It is not necessary, however, to probe more deeply with *Caldwell* and the other federal cases. We are responsible for controlling the scope of argument in our state courts and should hold, unequivocally, that prosecutors act improperly in attempting to minimize the jury's responsibility in cases in which sentencing is a jury function.

I am also concerned about the apparent effort of the prosecutor to indicate that the defendant had a prior homicide conviction. Advocates of capital punishment[1] often use the spectre of the repeat killer in support of their arguments. The prosecutor was not justified in seizing upon a line from defense counsel's opening statement to suggest something which was contrary to fact. But no objection was made, and defendant's criminal convictions were accurately detailed during the penalty phase, and so I am not persuaded that there was plain error.

With regard to the repeated attempts to minimize the jury's role, I would not hesitate to find plain error if the case was a less aggravated one. The prosecutor's contentions are subversive of the statutory plan. In a situation of this kind, the judge

should not simply remain silent until objection is made. There are times when the court must intervene in argument, to prevent distortion of the law. I can conceive of no strategic or tactical reason for defense counsel's silence. I hope that argument of this kind will not be again brought before this Court.

For those who believe in the death penalty, however, the killing of an unarmed prison guard presents a compelling case. The jury could have found that this defendant was one of the primary actors. Because of the grossness of the defendant's conduct and the absence of objection to the improper argument, I do not believe that a retrial of the penalty phase is necessary. I join in the vote to affirm the conviction and sentence.